# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: GARDASIL PRODUCTS LIABILITY LITIGATION | 3:22-md-03036-KDB |
| | MDL No. 3036 |
| JULIA OBERMIER, | |
| Plaintiff, | DIRECT-FILED COMPLAINT |
| v. | Case No. |
| MERCK & CO., INC. and MERCK SHARP & DOHME LLC, | |
| Defendants. | |

1
COMPLAINT

TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 5

PARTIES AND VENUE ............................................................................................................. 5

GENERAL ALLEGATIONS ...................................................................................................... 8

I.  Merck Has a History of Concealing Adverse Events of its Pharmaceutical Products........ 8

II. In Bringing Gardasil to Market, Merck Engaged in the Same Fraudulent Research and
   Marketing It Engaged in Vis-à-vis Vioxx, Resulting In Patients Being Exposed to a
   Vaccine Of Questionable Efficacy and Which Can Cause Serious and Debilitating
   Adverse Events ....................................................................................................................... 9

   A.  Overview of the Human Papillomavirus............................................................... 10

   B.  Overview of the Gardasil Vaccine and Its Fast-Tracked Approval...................... 11

   C.  Merck Engaged in Disease Mongering and False Advertising to Enhance Gardasil
       Sales ...................................................................................................................... 15

   D.  Merck Used Scare Tactics and Provided Financial Incentives to Legislatures to
       Attempt to make the Gardasil Vaccine Mandatory for All School Children........ 17

   E.  Merck Pushed Gardasil Using Trusted Doctors and Third-Party Front Groups... 19

   F.  Merck Has Systematically Misrepresented the Efficacy of Gardasil by
       Advertising that Gardasil Prevents Cervical Cancer When There Are No Clinical
       Studies to Support This False Claim...................................................................... 19

   G.  The Gardasil Vaccines Contain Ingredients that can Cause Adverse Effects,
       Including Aluminum Hydroxyphosphate Sulfate (AAHS) and HPV L1 Protein
       DNA Adjuvant ...................................................................................................... 22

       i.   Gardasil Contains a Highly Immunogenic Aluminum Adjuvant Never
            Tested in Humans Against True Placebo................................................... 22

       ii.  Merck Concealed the Fact that Gardasil Contained a Potentially
            Hazardous DNA Adjuvant........................................................................ 23

   H.  As it Did with Vioxx, In Conducting Its Clinical Trials, Merck Concealed Risks
       to Falsely Enhance the Safety Profile of Gardasil ............................................... 27

       i.   Small Clinical Trials ................................................................................ 29

ii.     Merck Used a Highly Immunogenic "Placebo" to Mask Gardasil's Risks ..................................................................................................................30

iii.    Merck Used Exclusionary Criteria to Further Conceal Gardasil Risks .....31

iv.    Merck Deceived Regulators and The Public by Classifying Many Serious Adverse Events, Which Afflicted Nearly Half of All Study Participants, As Coincidences........................................................................................32

v.     Merck Manipulated the Study Protocols to Block Participants and Researchers from Reporting Injuries and Conducted the Studies in a Manner That Masked Any Long-Term Adverse Events...........................33

vi.    Merck Deceived Regulators, Doctors, and the Public About Its Pivotal Gardasil Clinical Trial (Protocol 018) ......................................................35

I.    Merck has Concealed the Fact that Gardasil Induces and Increases the Risk of Autoimmune Diseases, and Other Injuries, Including But Not Limited to, POTS, Chronic Fatigue Syndrome, Neuropathy, Fibromyalgia, and Dysautonomia....... 37

J.    Merck has Concealed the Fact that Gardasil Increases the Risk of Fertility Problems .......................................................................................................... 41

K.    There were an Increased Number of Deaths in the Gardasil Studies ................... 42

L.    Post-Marketing Injuries -- The Raft of Injuries Seen in Merck's Clinical Trials Has Now Become a Population-Wide Chronic Disease Epidemic....................... 43

i.     In Light of Gardasil's Serious and Debilitating Adverse Events, the Japanese Government Rescinded Its Recommendation that Girls Receive Gardasil ......................................................................................................44

ii.    Denmark Has Opened Specialized Clinics Specifically Focused on Treating Gardasil-Induced Injuries, Including Gardasil-Induced Autoimmune Diseases ...............................................................................45

iii.    India Halted Gardasil Trials and Accused Merck of Corruption After the Death of Several Young Girls Who were Participants in the Trial...........46

M.    Merck's Fraud Has Paid Off Handsomely Resulting in Over \$6 Billion in Gardasil Sales Annually ...................................................................................................... 47

III.    Julia Obermier Sustained Serious Autoimmune, Autonomic, and Neurological Injuries as A Result of Her Gardasil Injections..................................................................................48

N.    Plaintiff Has Complied with the National Vaccine Injury Compensation Program Requirements ...................................................................................................... 53

CAUSES OF ACTION ................................................................................................... 54

COUNT ONE NEGLIGENCE ..................................................................................... 54

    COUNT TWO STRICT LIABILITY (FAILURE TO WARN) .................................. 57

    COUNT THREE STRICT LIABILITY (MANUFACTURING DEFECT) ............... 60

    COUNT FOUR BREACH OF EXPRESS WARRANTY .......................................... 64

    COUNT FIVE COMMON LAW FRAUD................................................................. 68

PRAYER FOR RELIEF ............................................................................................... 75

DEMAND FOR JURY TRIAL ................................................................................... 76

COMPLAINT

COMES NOW Plaintiff, Julia Obermier, who by and through counsel Wisner Baum, LLP., and alleges against defendants MERCK & CO., INC., and MERCK SHARP & DOHME LLC, and each of them, as follows:

## INTRODUCTION

1. This products liability action arises out of serious and debilitating injuries, including but not limited to autonomic, autoimmune, and neurological injuries and resulting sequalae that plaintiff, Julia Obermier sustained as a result of receiving the Gardasil vaccine, which was manufactured, labeled, and promoted by defendants Merck & Co., Inc., and Merck Sharp & Dohme LLC.

## PARTIES AND VENUE

2. Plaintiff, Julia Obermier ("Obermier" or "Plaintiff"), is an adult and a resident and citizen of Missouri.

3. Plaintiff avers that the federal judicial district in which Plaintiff received her first Gardasil dose is the District of Minnesota.

4. Plaintiff avers that the federal judicial district in which Plaintiff received her second Gardasil dose is the District of Minnesota.

5. Plaintiff avers that the federal judicial district in which Plaintiff received her third Gardasil dose is the District of Minnesota.

6. The federal judicial district in which Plaintiff currently resides is the Western District of Missouri.

7. But for the Order permitting direct filing into the Western District of North Carolina pursuant to Order No. 59, Plaintiff would have filed her case in the United States District Court for the District of Minnesota. Plaintiff thus hereby designates the United States

District Court for the District of Minnesota as the place of remand as this case may have originally been filed there.

8.    Defendant Merck & Co., Inc., is a New Jersey corporation with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey.

9.    Defendant Merck Sharp & Dohme LLC is a New Jersey Limited Liability Corporation with its principal place of business at 2000 Galloping Hill Rd., Kenilworth, New Jersey. On May 1, 2022, the entity "Merck, Sharp & Dohme Corporation" merged with Defendant Merck, Sharp & Dohme LLC, with Merck, Sharp & Dohme LLC as the surviving entity.

10.    Defendant Merck, Sharp & Dohme LLC has stipulated that it will participate in *In Re Gardasil Products Liability Litigation*, MDL No. 3036 as if it were the prior entity, "Merck, Sharp & Dohme Corporation."

11.    Defendant Merck & Co., Inc. is the sole member of Defendant Merck, Sharp & Dohme LLC.

12.    Defendants Merck & Co., Inc., and Merck Sharp and Dohme LLC shall hereinafter collectively be referred to as "Merck."

13.    At all times herein mentioned, each defendant was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other defendants named herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiff.

14.    At all times herein mentioned, defendants were fully informed of the actions of

their agents and employees, and thereafter no officer, director or managing agent of defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all defendants and each of them, thereby ratified those actions.

15. There exists and, at all times herein mentioned there existed, a unity of interest in ownership between the named defendants, such that any individuality and separateness between the defendants has ceased and these defendants are the alter-ego of each other and exerted control over each other.

16. At all times herein mentioned, both Merck defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by patients, such as Plaintiff and her medical providers. As such, the two Merck defendants are each individually, as well as jointly and severally, liable to Plaintiff for her damages.

17. Merck is the manufacturer, labeler and promoter of the Gardasil and Gardasil 9 vaccines, which are purported to be "cervical cancer vaccines" and "anal cancer vaccines" by preventing a handful of the hundreds of strains of the Human Papillomavirus ("HPV"). Merck regularly conducts and transacts business in Minnesota and North Carolina and has promoted Gardasil to consumers, patients, hospitals, physicians, nurses and medical professionals, including but not limited to Plaintiff, and the medical facility and medical professionals who prescribed and/or injected Plaintiff with Gardasil. This Court has personal jurisdiction over Merck because defendants have sufficient minimum contacts with Minnesota to render the exercise of jurisdiction proper.

18.     This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because Plaintiff and the defendants are citizens of different states and the amount of controversy exceeds $75,000.00, exclusive of interest and costs.

## GENERAL ALLEGATIONS

### I.     Merck Has a History of Concealing Adverse Events of its Pharmaceutical Products

19.     Merck is a multi-national, multi-billion-dollar company founded in 1891.

20.     Merck has produced a multitude of products, including controversial drugs like Fosamax, Nuvaring, and Vioxx, all of which led to litigation due to severe side effects.

21.     Throughout the early 2000's, Merck faced thousands of lawsuits from patients who suffered cardiovascular issues from Vioxx.

22.     Litigation revealed that Merck knew about Vioxx's cardiovascular risks but chose to conceal this information, misrepresent trial results, and blacklist critics.

23.     Internal documents showed Merck scientists were aware of Vioxx's risks early on, but the company influenced academic publications to downplay these dangers. *See e.g.*, Eric J. Topol, *Failing the Public Health – Rofecoxib, Merck, and the FDA*, 351 NEW ENGLAND JOURNAL OF MEDICINE 1707 (2004); Gregory D. Curfman et al., *Expression of Concern Reaffirmed*, 354 NEW ENGLAND JOURNAL OF MEDICINE 1193 (2006); Aaron S. Kesselheim et al., *Role of Litigation in Defining Drug Risks*, 17 JAMA 308 (2007); Harlan M. Krumholz et al., *What We Have Learnt From Vioxx*, 334 BRITISH MED. J. 120 (2007). Despite Merck's knowledge of the risk, Merck never conducted the necessary studies designed to evaluate cardiovascular risk. *Id.*

24.     A JAMA article reported that Merck hid adverse effects of Vioxx by not publishing data on heart attacks, revealed only after the drug was withdrawn. "The information came to public attention through a subpoena five years after the article's publication, when

[Vioxx] was already off the market."

25.    After the Vioxx scandal, Merck paid nearly $7 billion in settlements and fines.
Merck was also forced to pay $950 million in civil and criminal fines to the Department of
Justice and other governmental entities as a result of various criminal activities Merck had
engaged in with respect to Vioxx.

26.    Vioxx was withdrawn from the market in 2005, prompting Merck to seek a new
blockbuster drug to take its place. Gardasil was viewed as the answer to the financial and
reputational woes Merck had suffered from Vioxx.

## II.    In Bringing Gardasil to Market, Merck Engaged in the Same Fraudulent Research and Marketing It Engaged in Vis-à-vis Vioxx, Resulting In Patients Being Exposed to a Vaccine Of Questionable Efficacy and Which Can Cause Serious and Debilitating Adverse Events

27.    Following the Vioxx debacle, Merck's senior director of clinical research, Eliav
Barr, called Gardasil "the Holy Grail." As outlined herein, in researching, developing, and
marketing its new Holy Grail, Gardasil, Merck engaged in the same unscrupulous tactics it so
infamously engaged in with Vioxx.

28.    According to Merck's marketing claims, Gardasil (and, later, next-generation
Gardasil 9) purportedly provided lifetime immunity to cervical, anal and other HPV-associated
cancers.

29.    Despite Merck's claims, whether Gardasil prevents cancer (not to mention
lifetime immunity), is unproven. *See e.g.* Rees CP, Brhlikova P, Pollock AM, *Will HPV
vaccination prevent cervical cancer?* J R Soc Med. 2020; 113:64-78.

30.    Moreover, Merck knows and actively conceals the fact that Gardasil can cause a
constellation of serious adverse reactions and diseases, including autoimmune diseases, and
death in some recipients.

31.     As a result of Merck's fraud, Gardasil today is wreaking havoc on a vulnerable population of children and young adults on a worldwide scale.

**A.      Overview of the Human Papillomavirus**

32.     Human Papillomavirus ("HPV") is a viral infection that is passed between people through skin-to-skin contact. There are more than 200 strains of HPV, and of those, more than 40 strains can be passed through sexual contact. HPV is the most common sexually transmitted disease. It is so common that the majority of sexually active people will get it at some point in their lives, even if they have few sexual partners.

33.     HPV, for the most part, is benign. More than 90 percent of HPV infections cause no clinical symptoms, are self-limited, and are removed from the human body by its own immunological mechanisms and disappear naturally from the body following an infection. *See, e.g.*, Antonio C. de Freitas et al., *Susceptibility to cervical cancer: An Overview*, 126 GYNECOLOGIC ONCOLOGY 306 (August 2012).

34.     Not all HPV infections lead to cervical cancer. Only persistent infections with specific HPV strains can cause precancerous lesions. Precancerous lesions are typically detected via Pap smears and removed medically. If undiagnosed, these precancerous lesions might progress to cervical cancer. Other risk factors, like smoking, also contribute to cervical cancer. Certain HPV types are linked to other diseases, such as genital warts. *See* Antonio C. de Freitas et al., *Susceptibility to cervical cancer: An Overview*, 126 GYNECOLOGIC ONCOLOGY 305 (August 2012).

35.     Public health officials have long recommended the Pap test (also known as Pap Smear), which detects abnormalities in cervical tissue, as the most effective frontline public health response to the disease.

36.     Since its introduction, cervical cancer screening through the Pap test has reduced

the rates of cervical cancer in developed countries by up to 80 percent. *Id.*

37.     Incidences of cervical cancer have been declining dramatically worldwide as countries have implemented Pap screening programs.

38.     New cases of cervical cancer in the U.S. affect approximately 0.8 percent of women in their lifetime. *See Cancer Stat Facts: Cervical Cancer,* NIH, at https://seer.cancer.gov/statfacts/html/cervix.html. For those who are diagnosed, cervical cancer is largely treatable, with a five-year survival rate of over 90 percent when the cancer is caught early. *See* Antonio C. de Freitas et al., *Susceptibility to cervical cancer: An Overview*, 126 GYNECOLOGIC ONCOLOGY 305 (August 2012). Anal cancer is even rarer, and according to the current data, approximately 0.2 percent of people will be diagnosed with anal cancer in their lifetime.

39.     Although the incidence of cervical cancer was in rapid decline as a result of the implementation of routine testing and screening, including the Pap test and various DNA testing measures, Merck sought to fast-track a vaccine onto the market to prevent infection from four types of HPV (only two of which are associated with cancer).

**B.     Overview of the Gardasil Vaccine and Its Fast-Tracked Approval**

40.     Out of over 200 HPV types, only 12 to 18 are linked to cervical or anal cancer. Merck's original Gardasil vaccine targeted four strains (HPV Types 6, 11, 16, and 18), with only Types 16 and 18 associated with these cancers.

41.     To market a vaccine, the FDA requires manufacturers to test its effectiveness and safety. After approval, manufacturers must continue investigations and post-marketing surveillance. Gardasil received FDA approval on June 8, 2006, after a fast-tracked six-month review, despite unresolved safety and effectiveness questions. Approval was contingent on the

vaccine not containing viral DNA, but Merck did not disclose the presence of HPV DNA fragments or other crucial information to the FDA prior to approval. **In fact, Merck affirmatively told the FDA when it submitted its application that Gardasil *did not* contain any viral HPV DNA.**

42.     The FDA approved Gardasil for females ages 9-26 to prevent cervical cancer. On October 16, 2009, the FDA approved Gardasil for boys ages 9-26 to prevent genital warts, and in December 2010, it was approved for preventing anal cancer in both males and females ages 9-26.

43.     Thereafter, Merck never disclosed in its labeling or marketing that HPV L1 protein DNA fragments were present in each vial of Gardasil and Gardasil 9 or that the HPV L1 protein DNA fragments operate as additional immunogenic adjuvants.

44.     Merck never disclosed to the FDA or anyone else the actual measured amount of HPV L1 protein DNA in each Gardasil or Gardasil 9 vial, nor crucial safety and efficacy information regarding the presence and effect of HPV L1 DNA in Gardasil and Gardasil 9 vials, i.e., the stimulating or over-stimulating immune response HPV DNA can cause in vaccinees.

45.     Merck neglected necessary pre- and post-approval investigations, breaching FDA regulations and industry norms. Merck only estimated the amount of HPV L1 DNA in Gardasil and Gardasil 9; it did not quantify how much HPV L1 DNA is in each vial of Gardasil or Gardasil 9. Instead, Merck falsely asserted there was less than .15 picograms in each vial when in fact there was over 1000 times more than that and more than 500 times over the FDA limit for DNA in vaccines.

46.     *Based on the information Merck provided to the FDA*, in an October 21, 2011 FDA statement titled "FDA Information on Gardasil – Presence of DNA Fragments Expected, No Safety Risk," the FDA stated: "Since the early development of Gardasil, FDA and the

manufacturer (Merck and Co., Inc.) have known that after purification of the vaccine, small quantities of residual recombinant HPV L1-specific DNA fragments remain in the vaccine. Gardasil does not contain DNA from other HPV genes or any full-length infectious HPV genomes." The FDA erroneously came to this conclusion because Merck withheld information from and misled the FDA about the amount and the potential adverse consequences of the residual HPV DNA present in Gardasil.

47.     Subsequent to the approval and marketing of the quadrivalent Gardasil vaccine, Merck sought approval for Gardasil 9 (containing the same ingredients as Gardasil, but in higher quantities), which purportedly guarded against five additional HPV strains currently associated with cervical cancer and anal cancer (HPV Types 31, 33, 45, 52 and 58) than the original Gardasil, for a total of nine strains.

48.     The FDA approved Gardasil 9 in December 2014 for girls ages 9-26 and boys ages 9-15 to prevent cervical, vaginal, and anal cancers. Now, Gardasil 9 is approved and marketed to males and females ages 9-45, especially pre-teens. Despite limited evidence, the FDA recently fast-tracked its approval for preventing certain head and neck cancers. Gardasil, as a biologic product, must adhere to strict FDA manufacturing guidelines, but Merck has deviated from these specifications. After the approval of the Gardasil 9 vaccine, the original Gardasil vaccine was phased out of the U.S. Market; and the original Gardasil vaccine is no longer available for sale in the United States.

49.     According to data from the National Cancer Institute's ("NCI") Surveillance, Epidemiology and End Results Program ("SEER"), before Gardasil's introduction in the United States, cervical cancer deaths were steadily decreasing. In 2006, the rate was 2.4 per 100,000 women (approximately 1 in every 42,000 women). Data up to 2017 shows the current rate

remains essentially unchanged at 2.2 per 100,000 women.

50.     Fast-track review is a process under the Prescription Drug User Fee Act ("PDUFA") designed to facilitate the development of drugs, and to expedite their review, in order to treat serious conditions and fill an unmet medical need.

51.     Eager to market Gardasil swiftly after removal of Vioxx from the market, Merck pursued fast-track approval. Despite the availability of highly effective and side-effect-free interventions like Pap smears, there was no evidence showing Gardasil's superiority in preventing cervical cancer over Pap smears.

52.     Merck's clinical trials for Gardasil did not assess its cancer-prevention potential. Instead, Merck focused solely on Gardasil's ability to prevent HPV infections and cervical lesions graded from CIN1 (least serious) to CIN3 (most serious), most of which resolve without intervention. Similarly, trials did not explore Gardasil's efficacy in preventing anal cancer; Merck only looked at AIN lesions graded 1 through 3, with no Gardasil 9 studies on anal lesion prevention.

53.     According to the FDA, whether a condition is "serious" depends on such factors as "survival, day-to-day functioning, or the likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one." 21 C.F.R. § 312.300(b).

54.     Merck presented misleading data to the FDA suggesting that CIN2 and CIN3 inexorably result in cancer.

55.     Merck knows (and knew) that Gardasil and Gardasil 9 are far less effective than Pap tests in preventing cervical cancer.

56.     In order to obtain FDA approval, Merck conducted a series of fraudulent Gardasil studies and then influenced the votes of the FDA's Vaccines and Related Biological Products

Advisory Committee ("VRBPAC") and the CDC's Advisory Committee on Immunization Practices ("ACIP") to win both an FDA license and a CDC/ACIP approval and recommendation that all 11- and 12-year-old girls should be vaccinated with Gardasil.

57.     Merck aggressively marketed the vaccine directly to consumers and physicians, bypassing the need to establish a conventional market for the product.

58.     Julie Gerberding, then the Director of CDC, ushered the Gardasil vaccine through CDC's regulatory process manifestly ignoring clear evidence that Gardasil's efficacy was unproven, and that the vaccine was potentially dangerous.

59.     Merck, shortly thereafter, rewarded Gerberding by naming her President of Merck Vaccines in 2010.

60.     ACIP members have been allowed to vote on vaccine recommendations despite financial ties to drug companies. A 2000 U.S. House report found most of the CDC's eight ACIP members had conflicts of interest, with the Chairman serving on Merck's Immunization Advisory Board and other members receiving grants or salaries from Merck.

### C.     Merck Engaged in Disease Mongering and False Advertising to Enhance Gardasil Sales

61.     Prior to and after the approval of Gardasil, Merck engaged in unscrupulous marketing tactics which overemphasized both the risks associated with HPV and the purported efficacy of Gardasil to scare the public into agreeing to mass vaccinations of the Gardasil vaccine.

62.     Prior to Merck's aggressive marketing campaign, there was no HPV public health emergency in high-resource countries, such as the United States.

63.     The NCI's 2005 Health Information National Trends Survey ("HINTS") found that, among U.S. women 18 to 75 years old, 40 percent had heard of HPV. Among those who

had heard of HPV, less than half knew of an association between HPV and cervical cancer. Only four percent knew that the vast majority of HPV infections resolve without treatment.

64.    The stage was set for Merck to "educate" the public about HPV, cervical cancer, and Gardasil, all to Merck's advantage.

65.    Before launching Gardasil, Merck engaged in extensive disease awareness marketing for years. Merck's "Tell Someone" commercials, aimed at instilling fear about HPV and cervical cancer, ominously suggested that one could have HPV without knowing it. Although Gardasil had not yet received FDA approval, these commercials prominently featured Merck's logo and name.

66.    A year before obtaining licensing for its vaccine, Merck engaged in a major offensive in "disease branding" to create a market for its vaccine out of thin air.[1]

67.    Merck also engaged in a relentless propaganda campaign aimed at frightening and guilting parents who failed to inoculate their children with Gardasil.

68.    Prior to the FDA's 2006 approval of Gardasil, the media – under direction of Merck and its agents – dutifully reported alarming cervical cancer stories, accompanied by the promotion of an auspicious vaccine.

69.    Merck intended its campaign to create fear, panic and a public consensus that "good mothers vaccinate" their children with Gardasil. According to Merck propagandists, the only choice was to "get the vaccine immediately" or "risk cervical or anal cancer."

70.    Merck aggressively and fraudulently concealed Gardasil's risks in both broadcast materials and propaganda distributed in the United States, fully aware that if consumers were

---

[1] *See* Beth Herskovits, *Brand of the Year*, PHARMEXEC.COM, February 1, 2007. http://www.pharmexec.com/brand-year-0

informed about its risks and dubious benefits, very few would have chosen to vaccinate.

71.     Merck negligently and fraudulently deprived parents and children of their right to informed consent.

72.     In 2016, Merck aired a television campaign featuring child actors seemingly dying of cancer, asking their parents if they knew Gardasil could have prevented their cancers. The campaign cost $41 million over two months and omitted any mention of potential side effects. Merck also sent pamphlets via U.S. mail to doctors to promote the ads to their patients.

73.     Merck's fraudulent message was that cervical cancer and anal cancer were real-life killers of young men and women, notwithstanding the fact that the average age for development of cervical cancer is 50 years old, average age of development of anal cancer is 60 years old and that the cancer is virtually nonexistent in men and women under 20.

74.     Merck's "One Less" campaign falsely labeled Gardasil as a "cervical cancer vaccine," omitting its side effects and implying 100% effectiveness. Merck marketed Gardasil with the most aggressive campaign ever mounted to promote a vaccine, spending more on Gardasil advertising than any previous vaccine advertising campaign.

**D.      Merck Used Scare Tactics and Provided Financial Incentives to Legislatures to Attempt to make the Gardasil Vaccine Mandatory for All School Children**

75.     An ACIP recommendation of a vaccine, adopted by individual states, opens the door to mandates affecting as many as four million children annually.

76.     With Gardasil costing $360 for the original three-dose series (exclusive of the costs associated with medical appointments) and Gardasil 9 now priced at $450 for two doses (again, not including the cost of the medical appointments), Merck stood to earn billions of dollars per year, in the US alone, with little marketing costs.

77.     Prior to Gardasil's approval in 2006, Merck was already targeting political figures

to aid in the passage of mandatory vaccination laws.

78. As early as 2004, a group called Women in Government ("WIG") started receiving funding from Merck and other drug manufacturers who had a financial interest in the vaccine.

79. With the help of WIG, Merck aggressively lobbied legislators to mandate Gardasil to all sixth-grade girls. *See* Michelle Mello *et al.*, *Pharmaceutical Companies' Role in State Vaccination Policymaking: The Case of Human Papillomavirus Vaccination*, 102 AMERICAN J PUBLIC HEALTH 893 (May 2012).

80. In 2006, California Democratic Assembly leader Sally Lieber proposed a bill mandating Gardasil vaccination for sixth-grade girls. She withdrew the bill after a potential financial conflict of interest came to light.

81. Prior to the introduction of the bill, Lieber met with WIG representatives. In an interview, the President of WIG, Susan Crosby, confirmed that WIG funders have direct access to state legislators, in part through the organization's Legislative Business Roundtable, of which WIG funders are a part. *See* Judith Siers-Poisson, *The Gardasil Sell Job*, in CENSORED 2009: THE TOP 25 CENSORED STORIES OF 2007-08, 246 (Peter Philips ed. 2011).

82. Dr. Diane Harper, a medical doctor and scientist who was hired as a principal investigator on clinical trials for Gardasil gave an interview for an article on the HPV vaccines and WIG in 2007. Harper, who had been a major presenter at a WIG meeting in 2005, stated that "the Merck representative to WIG was strongly supporting the concept of mandates later in the WIG meetings and providing verbiage on which the legislators could base their proposals."

83. WIG was one of dozens of "pay to play" lobby groups that Merck mobilized to push HPV vaccine mandates.

84. Another group, the National Association of County and City Health Officials (NACCHO), was also pushing HPV vaccine mandates in all 50 states.

85. To that end, Merck made large contributions to political campaigns and legislative organizations. By February 2007, 24 states and the District of Columbia had introduced mandate legislation.

86. Several states passed laws allowing preteen children as young as age 12 to "consent" to vaccination with an HPV vaccine without parental consent or knowledge.

87. Merck funneled almost $92 million to Maryland's Department of Health between 2012 and 2018 to promote Gardasil in Maryland schools, in a fraudulent campaign that paid school officials to deliberately deceive children and parents into believing Gardasil was mandatary for school attendance. Josh Mazer, *Maryland should be up front about HPV vaccinations for children*, CAPITAL GAZETTE, August 14, 2018, at

https://www.capitalgazette.com/opinion/columns/ac-ce-column-mazer-20180814-story.html.

## E. Merck Pushed Gardasil Using Trusted Doctors and Third-Party Front Groups

88. Merck financed nonprofit groups with sizable donations to push Gardasil through education grants. Notably, the American College of Obstetricians and Gynecologists website revealed backing from Merck and Sanofi Pasteur US. Merck also rewarded influential doctors, termed "key opinion leaders," with $4,500 per Gardasil lecture.

89. These organizations allegedly independent but enlisted by Merck included the Immunization Coalition, Allegheny County Board of Health, Eye and Ear Foundation, Jewish Healthcare Foundation, American Dental Association, American College of Obstetricians and Gynecologists, and American Cancer Society.

## F. Merck Has Systematically Misrepresented the Efficacy of Gardasil by Advertising that Gardasil Prevents Cervical Cancer When There Are No

**Clinical Studies to Support This False Claim**

90.     No studies confirm Gardasil's cancer prevention. Since HPV infections take decades to progress, true efficacy studies would require extensive time and participants, which Merck avoided. Instead, it relied on surrogate endpoints to support Gardasil's effectiveness.

91.     Merck's clinical trials did not test whether HPV vaccines prevent cervical, anal or other cancers. Instead, Merck tested the vaccines against development of certain cervical lesions, which some researchers suspect are precursors to cancer, although the majority of these lesions – even the most serious – regress on their own. *See, e.g.*, Jin Yingji et al., *Use of Autoantibodies Against Tumor-Associated Antigens as Serum Biomarkers for Primary Screening of Cervical Cancer*, 8 ONCOTARGET 105425 (Dec. 1, 2017); Philip Castle et al., *Impact of Improved Classification on the Association of Human Papillomavirus With Cervical Precancer*, 171 AMERICAN JOURNAL OF EPIDEMIOLOGY 161 (Dec. 10, 2009); Karoliina Tainio et al., *Clinical Course of Untreated Cervical Intraepithelial Neoplasia Grade 2 Under Active Surveillance: Systematic Review and Meta-Analysis*, 360 BRIT. MED. J. k499 (Jan. 16, 2018).

92.     The Department of Health and Human Services (HHS), which oversees the FDA, and which also stood to make millions of dollars on the vaccine from patent royalties, allowed the use of Merck's proposed surrogate endpoints.

93.     The surrogate endpoints chosen by Merck to test the efficacy of its HPV vaccine were cervical and anal intraepithelial neoplasia (CIN) grades 2 and 3 and adenocarcinoma in situ.

94.     Merck used these surrogate endpoints even though it knew that these precursor lesions are common in young women under 25 and rarely progress to cancer.

95.     At the time FDA approved the vaccine, Merck's research showed only that Gardasil prevented certain lesions (the vast majority of which would have resolved on their own without intervention) and genital warts – not cancer itself, and only for a few years at that.

96. Using surrogate endpoints enabled Merck to shorten clinical trials to a few years and obtain regulatory approvals for the vaccines without evidence of long-term cancer prevention.

97. Merck's advertisements assert that the HPV vaccine prevents cervical cancer. For example, in a presentation to medical doctors, Merck proclaimed: "Every year that increases in coverage [of the vaccine] are delayed, another 4,400 women will go on to develop cervical cancer." The presentation goes on to tell doctors that women who do not get the vaccine will go on to develop cancer.

98. Merck's foundational theory that HPV alone causes cervical and anal cancer, while dogmatically asserted, is not proven.

99. Cervical and anal cancer involve multiple factors, including persistent HPV infections, along with environmental and genetic factors like smoking, oral contraceptives, nutrition, childbirth, obesity, and inflammation. Not all cases are linked to the HPV types in the vaccines, and some aren't associated with HPV at all.

100. *Merck knows* that the Gardasil vaccines cannot eliminate all cervical and anal cancer or any other cancer that may be associated with HPV.

101. Cervical and anal cancer takes decades to develop and there are no studies that prove the Gardasil vaccines prevent cancer.

102. A January 2020 UK study questioned the validity of Gardasil's clinical trials in assessing its ability to prevent cervical cancer. Researchers from Newcastle University and Queen Mary University of London found methodological flaws in the Phase 2 and 3 trials, casting doubt on the effectiveness of HPV vaccination. *See* Claire Rees et al., *Will HPV Vaccine Prevent Cancer?* J. OF THE ROYAL SOC. OF MED. 1-15 (2020).

103. As Dr. Tom Jefferson of the Centre for Evidence-Based Medicine pointed out: "The reason for choosing vaccination against HPV was to prevent cancer but there's no clinical evidence to prove it will do that."

104. Gardasil lacks proof of preventing cervical or any cancer. Despite this, Merck marketed it as highly effective against cervical and anal cancer, although it only protects against four to nine out of over 200 HPV strains.

## G. The Gardasil Vaccines Contain Ingredients that can Cause Adverse Effects, Including Aluminum Hydroxyphosphate Sulfate (AAHS) and HPV L1 Protein DNA Adjuvant

### i. Gardasil Contains a Highly Immunogenic Aluminum Adjuvant Never Tested in Humans Against True Placebo

105. To stimulate an enhanced immune response that allegedly *might possibly* last for 50 years, Merck added to the Gardasil vaccine an aluminum-containing adjuvant – Amorphous Aluminum Hydroxyphosphate Sulfate ("AAHS").

106. Aluminum is a potent neurotoxin that can result in serious harm, and Merck failed to warn of these harms.

107. The original Gardasil vaccine contains 225 micrograms of AAHS and Gardasil 9 contains 500 micrograms of AAHS.

108. Federal law requires that manufacturers cannot add adjuvants to vaccines that have not been proven safe. 21 C.F.R. § 610.15(a).

109. AAHS has never been proven safe. AAHS is a proprietary blend of aluminum and other unknown ingredients developed by Merck and used in Merck vaccines, including Gardasil. Prior vaccines have used a different aluminum formulation.

110. Peer-reviewed studies show that aluminum binds to non-vaccine proteins, including the host's own proteins, or to latent viruses, triggering autoimmune and other serious

22
COMPLAINT

conditions. See Darja Kanduc, *Peptide Cross-reactivity: The Original Sin of Vaccines*, 4
FRONTIERS IN BIOSCIENCE 1393 (June 2012).

111.    Aluminum, including AAHS, is associated with numerous systemic side effects
such as cognitive and motor impairment, autoimmune interactions, and disruptions to brain
function and cell communication.  It can also induce muscle inflammation and alter DNA.

### ii.    Merck Concealed the Fact that Gardasil Contained a Potentially Hazardous DNA Adjuvant

112.    Merck has repeatedly concealed or incorrectly identified Gardasil ingredients to
the FDA and the public.

113.    Merck concealed from the FDA and the public that Gardasil contained a
potentially hazardous ingredient, HPV LI-DNA fragments.  These DNA fragments can act as a
Toll-Like Receptor 9 ("TLR9") agonist – further adjuvanting the vaccine and making it more
potent.  Merck used this adjuvant to prolong the immunologic effects of the vaccine but illegally
omitted it from its list of substances and ingredients in the vaccines' labeling and marketing,
thereby altering its intended composition and performance.

114.    By illegally omitting the presence and amount of HPV LI-DNA fragments from
the list of substances and ingredients in Gardasil, as required by federal regulations, Merck
deviated from the established manufacturing standards. Dr. Sin Hang Lee, a pathologist and
former faculty member at McGill University and Yale, and current director of Milford Molecular
Diagnostics, has opined that, without adding the TLR9 agonist, Gardasil would not have viable,
durable immunogenicity.  The DNA fragments bound to the AAHS nanoparticles act as the
TLR9 agonist in both Gardasil and Gardasil 9 vaccines, creating the strongest immune-boosting
adjuvant in use in any vaccine.

115.    Each vial of Gardasil contains non-replicating outer shells of HPV generated by

recombinant DNA inserted into yeast cells. The yeast cells "brew" individual HPV shell proteins that, like Lego pieces, assemble into spheres known as Virus Like Particles (VLPs). Human immune systems react to VLPs as if they are live viruses and generate cellular and antibody immune responses to neutralize future exposures to actual live HPV. Gardasil combines HPV VLPs with aluminum and HPV shell protein DNA to boost and prolong the immune response. Merck's proprietary aluminum and HPV shell protein DNA are what is called "adjuvants." Merck does not list the presence or amount of HPV shell protein DNA as an adjuvant in Gardasil labeling or marketing, in violation of 21 CFR 201.57(c)(4), 21 CFR 610.61.

116. Merck told the FDA and regulators around the world that the amount of HPV L1 DNA in Gardasil vials was less than .15 picograms. That was false—Merck never measured how much HPV L1 DNA is in Gardasil, but estimated the amount based on yeast genome DNA, which is 1000's of times off—Merck used the wrong metric (yeast genome DNA) for estimating, and internally admitted it never measured HPV L1 DNA in Gardasil and did not intend to do so.

117. Microbial (viral or bacterial) DNA is known to stimulate a receptor in immune cells that initiates cellular immune response, Toll-like receptor 9 (TLR9). The presence of such HPV L1 DNA particles in Gardasil augments the inflammatory and immune responses following Gardasil vaccination, thereby increasing the vaccine's auto reactogenic potential. When directly asked by foreign regulatory bodies about HPV L1 DNA in Gardasil acting as an adjuvant boosting Gardasil's immunogenicity, Merck executives and legal advisors concealed its existence, denied the connection, and internally declined to investigate further.

118. Combining the already highly immunogenic VLPs with Merck's highly potent aluminum adjuvant along with HPV L1 DNA quantities over 500 times the FDA limit for DNA in vaccines can cause prolonged hyperstimulation of the immune system which is one of the key

COMPLAINT

factors in initiating and perpetuating autoimmune responses.

119. In sum, Merck improperly failed to include in Gardasil's labeling and marketing that Gardasil contains HPV L1 DNA—the DNA that generates the L1 shell proteins for the Gardasil VLPs. In Merck's 2006 application and Final Briefing Document sent to the FDA to obtain approval of Gardasil, Merck stated "Gardasil contains no viral DNA." That was false. Later, in 2011 after Dr. Sin Hang Lee announced his discovery of HPV L1 DNA in multiple Gardasil vials, Merck acknowledged the presence of HPV L1 DNA in Gardasil, but falsely asserted it was "not DNA from HPV itself." The FDA was misled by Merck when it concluded only "small quantities of residual recombinant HPV L1-specific DNA fragments remain in the vaccine. Gardasil does not contain DNA from other HPV genes or any full-length infectious HPV genomes." The truth was that HPV L1 DNA in Gardasil is spliced from actual HPV viruses found in human vaginal lesions. Sections of that live HPV DNA are inserted into yeast plasmid DNA which then generates the L1 proteins that assemble into VLPs, hence a "recombinant" HPV DNA derived from actual HPV DNA.

120. On multiple occasions, Merck falsely represented to the FDA and others, including regulators in other countries, the amount and immunogenic adjuvant activity of the HPV L1 protein DNA in Gardasil, asserting there was no infectious HPV DNA in Gardasil, while failing to disclose the amount and immunogenicity of the HPV L1 Protein DNA fragments present in each vial of Gardasil.

121. This HPV L1 Protein DNA adjuvant is not approved by the FDA and Merck does not list it among the ingredients as federal law requires. See 21 C.F.R. § 610.61(o) (requiring that adjuvants be listed on biologics' labeling). Even if not an adjuvant, the DNA fragments should have been listed because they represent a safety issue. 21 C.F.R. §610.61(n).

122.    Proper disclosure of adjuvants in vaccine labeling and marketing is crucial for informed decision-making for doctors and consumers. Merck's failure to include the presence and amount of HPV LI-Protein DNA fragments in Gardasil deprived consumers of vital information, resulting in a vaccine with greater undisclosed risks.

123.    Dr. Sin Hang Lee tested 16 sealed Gardasil vials collected from Australia, Bulgaria, France, India, New Zealand, Poland, Russia, Spain, and the United States, representing a cross-section of vaccine lots. Using a sensitive nested PCR method to detect DNA, Dr. Lee found HPV L1 Protein DNA from HPV 18 or HPV 11, or both, in each vial.

124.    When Dr. Lee found HPV L1 Protein DNA fragments in every Gardasil vial tested, from all over the world, Merck at first denied, and then finally admitted, the vaccine does indeed include HPV L1-DNA fragments, but Merck still did not add it to Gardasil's labeling or marketing.

125.    From 2011 up to the present, Merck falsely asserted the HPV L1 DNAs in Gardasil are merely residual fragments leftover from the purification process, stating "VLPs do not contain intact viral DNA." This statement is misleading—strain 18 VLPs contain intact HPV L1 DNA because HPV strain 18 VLPS do not get disassembled during manufacture. The HPV Strain 18 LI DNA inside strain 18 VLPs proceed through manufacturing, protected from degradation by DNA enzymes. The HPV L1 DNAs packaged in the other VLPs are released when those VLPs get disassembled, then they are bound to the AAHS in a manner that protects them from degradation by DNA enzymes as well. These HPV L1 DNA particles are firmly bound to the AAHS adjuvant and thus are resistant to degradation by endogenous nucleases.

126.    To this day, the Gardasil package inserts do not disclose that HPV L1 Protein DNA fragments remain in the vaccine, the amount of HPV L1 Protein DNA in each vial, and

that the HPV L1 Protein DNA fragments in each vial of Gardasil operate as TLR 9 agonists, which can result in potential negative health effects including autoimmune conditions in some vaccinees like Plaintiff.

127. Merck's failure to fully disclose vaccine ingredients violates regulatory standards and compromises product safety and integrity.

128. The scientific literature suggests there are grave and little-understood risks attendant to injecting DNA into the human body.

129. By failing to disclose in Gardasil's labeling or marketing the presence, immunogenicity, amount and harmful effects of HPV LI-Protein DNA fragments in Gardasil, Merck has produced a vaccine that poses an unreasonable risk of harm that consumers and physicians were not warned of.

### H. As it Did with Vioxx, In Conducting Its Clinical Trials, Merck Concealed Risks to Falsely Enhance the Safety Profile of Gardasil

130. Merck engaged in wholesale fraud during its efficacy and safety clinical studies.

131. In order to obtain its Gardasil license, Merck purposefully conducted its studies to conceal adverse events.

132. Merck sold Gardasil to the public falsely claiming that pre-licensing efficacy and safety tests proved it to be safe.

133. Merck deliberately crafted the study protocols in a manner that would conceal evidence of chronic conditions such as autoimmune diseases associated with Gardasil during clinical studies.

134. Merck employed deceptive means to cover up injuries that study group participants suffered.

135. Merck's clinical trials had numerous flaws. For instance, Merck failed to use a

true placebo in comparison to Gardasil in the clinical trials with the exception of one small study, thus obscuring Gardasil's adverse event profile; Merck falsely called its proprietary aluminum adjuvant (AAHS) a "placebo"; Merck counted adverse events only if they occurred within 14 days and only if deemed by a study coordinator paid by Merck to be vaccine-related, thus excluding as much as 90% of adverse events that take longer to manifest; and Merck misleadingly called adverse events that occurred after 14 days "new medical history" rather than adverse events. Merck underreported potential harms of Gardasil; left out a significant amount of essential data from its study reports even though Merck collected the data; and split the data it presented in so many ways making it difficult for any reviewer to conduct a proper safety analysis. The flaws in Merck's clinical trials are so pervasive that Merck's clinical trials cannot be used to fully assess Gardasil's risks. It would be difficult if not impossible for any scientist, including regulators, to assemble the data in a way that would allow a full evaluation of Gardasil's risks.

136.     In early 2018, Lars Jørgensen, M.D., Ph.D. and Professor Peter Gøtzsche, M.D. (then with the Nordic Cochrane Centre), and Professor Tom Jefferson, M.D., of the Centre for Evidence-Based Medicine, published a study indexing all known industry and non-industry HPV vaccine clinical trials and were disturbed to find that regulators such as the FDA and EMA (European Medicines Agency) assessed as little as half of all available clinical trial results when approving the HPV vaccines. Lars Jørgensen et al., *Index of the Human Papillomavirus (HPV) Vaccine Industry Clinical Study Programmers and Non-Industry Funded Studies: a Necessary Basis to Address Reporting Bias in a Systematic Review*, 7 SYSTEMATIC REVIEWS (January 18, 2018).

137.     Per the indexing study discussed above, Merck appears to have kept a number of

its clinical trial results secret. Moreover, it appears that Merck reported only those findings that supported its own agenda.

138.     Three separate reviews of the Gardasil vaccine by the Cochrane Collaboration found that the trial data were "largely inadequate."

139.     In 2019, medical professionals highlighted flaws in publications about Merck's Gardasil clinical trials in the British Medical Journal. They called for independent researchers to reanalyze or restore reporting of these trials, noting incomplete methodological details and inaccuracies in describing the control arm's formulation. Contrary to claims of placebo-controlled trials, participants in the control arm received an injection containing AAHS, a highly immunogenic adjuvant used in Gardasil. Peter Doshi et al., *Call to Action: RIAT Restoration of Previously Unpublished Methodology in Gardasil Vaccine Trials*, 346 BRIT. MED. J. 2865 (2019).

140.     The researchers opined that "the choice of AAHS-containing controls complicates the interpretation of efficacy and safety results in trials ... We consider the omission in journal articles, of any rationale for the selection of AAHS-containing control, to be a form of incomplete reporting (of important methodological details) and believe the rationale must be reported. We also consider that use of the term 'placebo' to describe an active comparator like AAHS inaccurately describes the formulation that the control arm received, and constitutes an important error that requires correction." *Id.* The authors pointed out that Merck's conduct "raises ethical questions about trial conduct as well" and that they and other scientists would need to review the Gardasil clinical trial raw data, in order to be able to analyze the safety and adverse event profile of Gardasil meaningfully and independently. *Id.*

        i.       **Small Clinical Trials**

141. Merck's clinical trials for HPV vaccines focused on a small percentage of the primary target population, 9 to 12-year-olds. Only Protocol 018 compared vaccinated children to those who did not receive the vaccine, with less than 1,000 participants aged 12 and younger. In Protocol 018, 696 children received the vaccine, while 372 received a non-aluminum control.

142. The small size of this trial means that it was incapable of ascertaining all injuries that could occur as a result of the vaccine.

### ii. Merck Used a Highly Immunogenic "Placebo" to Mask Gardasil's Risks

143. Merck used a highly immunogenic placebo instead of an inert one in Gardasil trials to hide the vaccine's risks. In Protocol 018, only 372 children received a non-saline placebo containing all vaccine components except the adjuvant and antigen.

144. Using an inactive placebo for comparison provides an accurate assessment of a product's effects, according to the World Health Organization (WHO). However, using a comparator that causes its own adverse side effects, as Merck did, creates a "methodological disadvantage," making it difficult or impossible to evaluate vaccine safety without a true placebo.

145. Merck deliberately used highly immunogenic "placebos" in the control group, in order to mask harms caused by Gardasil to the study group.

146. Instead of testing Gardasil against a control with a true inert placebo, Merck tested its vaccine in almost all clinical trials against its highly neurotoxic aluminum adjuvant, AAHS.

147. Merck gave neurotoxic aluminum injections to approximately 10,000 girls and young women participating in Gardasil trials, to conceal the dangers of Gardasil vaccines.

148. Merck injected AAHS into thousands of girls and young women in control groups

30
COMPLAINT

without safety testing. They were not informed that they might receive an aluminum "placebo," as Merck claimed they would receive either the vaccine or a safe inert placebo.

149. Merck breached clinical trial rules by deceiving volunteers about the placebo, falsely stating it was an inert saline solution when it actually contained the neurotoxic aluminum adjuvant, AAHS.

150. AAHS provoked injuries and deaths in a number of the study participants when Merck illegally dosed the control group volunteers with AAHS.

151. Since the injuries in the Gardasil group were replicated in the AAHS control group, this scheme allowed Merck to falsely conclude that Gardasil's safety profile was comparable to the "placebo."

152. The scheme worked and enabled Merck to secure FDA licensing.

153. Merck lied to the FDA when it told public health officials that it had used a saline placebo in Protocol 018.

154. Merck lacked a valid public health reason for not using a true saline placebo in the original Gardasil trials, as there were no licensed vaccines for the targeted HPV strains at that time. In a subsequent Gardasil 9 trial, only a few girls may have received the saline placebo after already receiving three doses of Gardasil.

### iii. Merck Used Exclusionary Criteria to Further Conceal Gardasil Risks

155. Merck also manipulated the Gardasil studies by excluding nearly half of the original recruits to avoid revealing the effects of the vaccine on vulnerable populations.

156. After recruiting thousands of volunteers to its study, Merck excluded all women who had admitted to vulnerabilities that might be aggravated by the vaccine, such as abnormal Pap tests or a history of immunological or nervous system disorders.

157.     Women could also be excluded for "[a]ny condition which in the opinion of the investigator might interfere with the evaluation of the study objectives."

158.     Merck's protocol excluded subjects with allergies to vaccine ingredients like aluminum (AAHS), yeast, and certain enzymes, for which there are limited resources to test allergies beforehand. Additionally, individuals with serious medical conditions were excluded from Gardasil clinical trials, despite CDC recommending the vaccine for everyone, regardless of medical condition. Merck aimed to exclude subjects from subgroups prone to injuries or adverse reactions to Gardasil's ingredients.

159.     The study exclusion criteria are not listed as warnings on the package inserts and the package insert for Gardasil only mentions an allergy to yeast or to a previous dose of Gardasil as a contraindication, rather than an allergy to any other component. Nonetheless, for most of the ingredients, it is almost impossible to determine if such an allergy exists prior to being vaccinated and Merck does not recommend allergy testing before administering the vaccine.

160.     Merck tested Gardasil on healthy participants, not representative of those who would ultimately receive the vaccine, masking potential harmful effects on vulnerable subgroups. Thus, the clinical trial population was less vulnerable than the current Gardasil recipients.

### iv.     Merck Deceived Regulators and The Public by Classifying Many Serious Adverse Events, Which Afflicted Nearly Half of All Study Participants, As Coincidences

161.     Because Merck did not use a true placebo, determining which injuries were attributable to the vaccine and which were attributable to unfortunate coincidence was entirely within the discretion of Merck's paid researchers.

162. In order to cover up and conceal injuries from its experimental vaccine, Merck, during the Gardasil trials, employed a metric, "new medical conditions," that allowed the company to dismiss and fraudulently conceal infections, reproductive disorders, neurological symptoms, and autoimmune conditions, which affected a troubling 50 percent of all clinical trial participants.

163. Merck's researchers systematically dismissed reports of serious adverse events from 49 percent of trial participants in order to mask the dangers of the vaccine.

164. Instead of reporting these injuries as "adverse events," Merck dismissed practically all of these illnesses and injuries as unrelated to the vaccine by classifying them under "new medical conditions," a scheme Merck could get away with only because it used a "spiked" placebo, that was yielding injuries at comparable rates.

165. Conducting studies without a true placebo gave Merck investigators broad authority to define adverse events, allowing them to dismiss serious vaccine injuries, which affected half of the trial volunteers, as coincidental.

   v.    **Merck Manipulated the Study Protocols to Block Participants and Researchers from Reporting Injuries and Conducted the Studies in a Manner That Masked Any Long-Term Adverse Events**

166. Merck adopted multiple strategies to discourage test subjects from reporting injuries. Merck distributed Vaccination Report Cards to a select few trial participants, such as about 10% in Protocol 015, all from the United States despite global trial sites, to document reactions in the days post-injection.

167. The report cards only listed "Approved Injuries," mainly injection site reactions, and excluded space for more serious unexplained injuries like autoimmune diseases. They were designed to only report non-serious reactions intentionally.

168. Merck instructed participants to record information for only 14 days post-injection, preventing reporting of injuries with longer incubation periods or delayed diagnosis.

169. Shortened reporting periods were part of Merck's scheme to hide chronic conditions associated with the vaccine, such as autoimmune or menstrual cycle problems, and premature ovarian failure, unlikely to manifest within the first 14 days post-injection.

170. Merck researchers did not systematically collect adverse event data from the trials, which were spread out over hundreds of test sites all over the world.

171. To conceal the dangerous side effects of its vaccine, Merck purposely did not follow up with girls who experienced serious adverse events during the Gardasil clinical trials.

172. Merck failed to provide the trial subjects a standardized questionnaire checklist of symptoms, to document a comparison of pre- and post-inoculation symptoms.

173. Merck discouraged clinicians from reporting adverse events by imposing burdensome and time-consuming paperwork requirements without offering additional compensation.

174. Merck discouraged researchers from reviewing participants' medical records, even when serious adverse events occurred as described in the protocol.

175. Merck allowed researchers wide discretion in defining reportable adverse events, encouraging minimal reporting and dismissing injuries as unrelated to the vaccine. They used subjective data collection methods, relying on participant recollections and biased trial investigators.

176. Merck downplayed serious injuries and used statistical tactics to underreport them.

177. In Gardasil trials, Merck failed to capture and code adverse events adequately,

including autoimmune or neurological injuries like POTS and CRPS, preventing awareness and evading the need for appropriate warnings.

### vi. Merck Deceived Regulators, Doctors, and the Public About Its Pivotal Gardasil Clinical Trial (Protocol 018)

178. Merck tested Gardasil and Gardasil 9 in some 50 clinical trials, each one called a "Protocol." However, results for many of these studies are not available to the public or even to the regulators licensing Gardasil. *See* Lars Jørgensen, *et al., Index of the Human Papillomavirus (HPV) Vaccine Industry Clinical Study Programmers and Non-Industry Funded Studies: a Necessary Basis to Address Reporting Bias in a Systematic Review*, 7 SYSTEMATIC REVIEWS 8 (January 18, 2018).

179. Gardasil's most important clinical trial was Protocol 018. The FDA considered Protocol 018 the pivotal trial upon which Gardasil licensing approvals hinged, because FDA believed (1) it was the only trial where Merck used a "true saline placebo,"; and (2) it was the only trial with a comparator group that included girls aged 11 to 12 – the target age for the Gardasil vaccine.[2]

180. Merck deceived regulators, the public, and trial subjects by falsely claiming that the Protocol 018 "placebo" group received a genuine saline or inert placebo, a description echoed by the FDA upon Gardasil's approval.

181. The FDA declared that the Protocol 018 trial was "of particular interest" because Merck used a true saline placebo instead of the adjuvant as a control.

182. Merck told regulators that it gave a "saline placebo" to only one small group of approximately 600 nine to 15-year-old children.

---

[2] *See* Transcript of FDA Center For Biologics Evaluation and Research VRBPAC Meeting, May 18, 2006, at 93 (Dr. Nancy Miller).

183. In fact, Merck did not give even this modest control group a true saline placebo, but rather, the group members were given a shot containing "the carrier solution" – a combination of substances including polysorbate 80, sodium borate (borax), genetically modified yeast, L-histidine, and possibly a fragmented DNA adjuvant.

184. The only components of Gardasil the control group did not receive were the HPV antigens and the aluminum adjuvant.

185. Despite the combination of chemicals in the carrier solution, those children fared much better than any other study or control group participants, all of whom received the AAHS aluminum adjuvant.

186. Only 29 percent of the vaccinated children and 31 percent of control recipients in Protocol 018 reported new illnesses from Day 1 through Month 12, compared to an alarming 49.6 percent of those vaccinated and 49 percent of AAHS controls in the "pooled group" (composed of some 10,000 young women and with the other participants combined) from Day 1 only through Month 7 (not 12). Because the pooled group also included Protocol 018, even those numbers may not be accurate with respect to those who received either a vaccine with a full dose of AAHS or those who received an AAHS control.

187. In Protocol 018, fewer participants in the control group developed systemic autoimmune diseases compared to the pooled group (2.3 percent or 1 in every 43). In a 2008 FDA review, three girls in the carrier-solution group had autoimmune disease. Considering the original 2006 clinical review's placebo group size, fewer than 1 percent of girls in the carrier solution group reported autoimmune disease.

188. To deceive the public and regulators, Merck halved the aluminum adjuvant dose for nine to fifteen-year-olds in Protocol 018, resulting in significantly fewer "new medical

conditions" compared to other protocols.

189.     Merck pretended that the vaccinated children in the Protocol 018 study group
received the full dose adjuvant by obfuscating the change in formulation in the description.

190.     Merck cut the adjuvant in half, knowing that this would artificially and
fraudulently lower the number of adverse events and create the illusion that the vaccine was safe.

191.     Merck lied about this fact to the FDA.

192.     The study data does not support Gardasil's safety since Merck tested a product
with only half the dose of Gardasil's most toxic component.

193.     This is blatant scientific fraud, which continues to this day because this is the
study upon which current vaccine safety and long-term efficacy assurances are based.

194.     As set forth above, Merck's deception served its purpose: Only 29 percent of the
vaccinated children in Protocol 018 reported new illness, compared to an alarming 49.6 percent
in the pooled group to receive the full dose adjuvant in the vaccine.

I.     **Merck has Concealed the Fact that Gardasil Induces and Increases the Risk of Autoimmune Diseases, and Other Injuries, Including But Not Limited to, POTS, Chronic Fatigue Syndrome, Neuropathy, Fibromyalgia, and Dysautonomia**

195.     Gardasil induces and increases the risk of autoimmune disease.

196.     Gardasil has been linked to a myriad of autoimmune disorders, including but not
limited, to:  Guillain–Barré syndrome ("GBS"), postural orthostatic tachycardia syndrome
("POTS"), Orthostatic Intolerance ("OI"), chronic inflammatory demyelinating polyneuropathy
("CDIP"), small fiber neuropathy ("SNF"),  systemic lupus erythematosus ("SLE"), immune
thrombocytopenic purpura ("ITP"), multiple sclerosis ("MS"), acute disseminated
encephalomyelitis ("ADEM"), antiphospholipid syndrome ("APS"), transverse myelitis,
rheumatoid arthritis, interconnective tissue disorder, autoimmune pancreatitis ("AIP") and

autoimmune hepatitis.

197.     Gardasil has also been linked to a myriad of diseases and symptoms that are associated with induced-autoimmune disease, including for example, fibromyalgia, dysautonomia, premature ovarian failure, chronic fatigue syndrome ("CFS"), chronic regional pain syndrome ("CRPS"), cognitive dysfunction, migraines, severe headaches, persistent gastrointestinal discomfort, widespread pain of a neuropathic character, encephalitis syndrome, autonomic dysfunction, joint pain, and brain fog.

198.     In the 2015 textbook "Vaccines and Autoimmunity," Dr. Yehuda Shoenfeld and leading experts concluded that Gardasil can cause autoimmune disorders due to its strong immune-stimulating ingredients. *See* Lucija Tomljenovic & Christopher A. Shaw, *Adverse Reactions to Human Papillomavirus Vaccines*, VACCINES & AUTOIMMUNITY 163 (Yehuda Shoenfeld et al. eds., 2015).

199.     Medical experts believe the adjuvants in Gardasil vaccines cause autoimmune diseases in some patients, leading to the term Autoimmune/Inflammatory Syndrome Induced by Adjuvants (ASIA) to describe these immune-mediated diseases triggered by vaccine adjuvants like aluminum. See e.g., YEHUDA SHOENFELD ET AL, EDS, VACCINES & AUTOIMMUNITY 2 (2015).

200.     Animal studies, such as those by Lluís Luján, DVM, Ph.D., have shown that aluminum adjuvants can induce severe autoimmune diseases and other adverse reactions. For example, sheep injected with aluminum-containing adjuvants frequently developed severe autoimmune diseases.

201.     Gardasil vaccines contain adjuvants like amorphous aluminum hydroxyphosphate sulfate (AAHS) and unlabeled HPV L1 Protein DNA fragments, which have been linked to mechanisms inducing autoimmune diseases in some patients.

202. These DNA fragments serve as a Toll-Like Receptor 9 (TLR9) agonist, enhancing the vaccine's potency as an adjuvant, further inducing such autoimmune diseases.

203. HPV is common but usually not excessively immunogenic, meaning it does not typically trigger autoimmune responses.

204. To induce robust, long term anti-HPV immune reactions, Merck added various adjuvants, including amorphous aluminum hydroxyphosphate sulfate (AAHS), to the Gardasil vaccine. Adjuvants, such as aluminum, are inflammatory substances that hyperactivate the immune system. Adjuvants are thus the "secret sauce" used by Merck to hyperactivate the immune system and make HPV vaccines have robust, durable long-term immunogenicity to support Merck's claims that Gardasil prevents persisting infections of HPV that lead to cervical cancer.

205. Gardasil triggers immune hyperactivation, producing anti-HPV antibodies. However, it can also cause the immune system to attack the body's own proteins and organs due to similarities between HPV and human proteins, known as "molecular mimicry." This can lead to various autoimmune diseases across different organs.

206. Gardasil can induce autoimmune diseases through mechanisms like "molecular mimicry," where similarities between Gardasil antigens and human proteins trigger autoimmune responses. Other mechanisms include "epitope spreading," where Gardasil antigens, including the aluminum adjuvant, activate autoimmune processes, and "bystander activation," where the vaccine's antigens and adjuvants activate pre-primed autoreactive T cells, leading to autoimmune diseases or unintended cell destruction.

207. A variety of published medical journal articles have discussed the association between Gardasil and a myriad of serious injuries and have reported on patients developing

postural orthostatic Tachycardia Syndrome (POTS), Orthostatic Intolerance (OI), fibromyalgia and other symptoms of autonomic impairment following Gardasil vaccination. *See e.g.,* Svetlana Blitshetyn, *Postural Tachycardia Syndrome After Vaccination with Gardasil*, 17 EUROPEAN J. OF NEUROLOGY e52 (2010); Svetlana Blitshetyn, *Postural Tachycardia Syndrome Following Human Papillomavirus Vaccination*, 21 EUROPEAN J. OF NEUROLOGY 135 (2014); Tomomi Kinoshita et al., *Peripheral Sympathetic Nerve Dysfunction in Adolescent Japanese Girls Following Immunization With Human Papillomavirus Vaccine,* 53 INTERNAL MEDICINE 2185 (2014); Louise S. Brinth et al., *Orthostatic Intolerance and Postural Tachycardia Syndrome As Suspected Adverse Effects of Vaccination Against Human Papilloma Virus*, 33 VACCINE 2602 (2015); Manuel Martinez-Lavin et al., *HPV Vaccination Syndrome. A Questionnaire Based Study*, 34 J. CLINICAL RHEUMATOLOGY 1981 (2015); Louise S. Brinth et al., *Is Chronic Fatigue Syndrome/Myalgic Encephalomyelitis a Relevant Diagnosis in Patients with Suspected Side Effects to Human Papilloma Virus Vaccine*, 1 INT. J. OF VACCINE & VACCINATION 3 (2015); Jill R. Schofield et al., *Autoimmunity, Autonomic Neuropathy, and HPV Vaccination, A Vulnerable Subpopulation*, CLINICAL PEDIATRICS (2017); Rebecca E. Chandler et al., *Current Safety Concerns With Human Papillomavirus Vaccine: A Cluster Analysis of Reports in VigiBase*, 40 DRUG SAFETY 81 (2017); Svetlana Blitshetyn et al., *Autonomic Dysfunction and HPV Immunization An Overview*, IMMUNOLOGIC RESEARCH (2018); and Svetlana Blitshetyn, *Human Papilloma Virus (HPV) Vaccine Safety Concerning POTS, CRPS and Related Conditions*, CLINICAL AUTONOMIC RESEARCH (2019).

208.    In a February 2020 peer-reviewed study, researchers who analyzed the available clinical trial data for all HPV vaccines, which include the Gardasil vaccines and another HPV vaccine currently only available in Europe, concluded that "HPV vaccines increased serious

nervous disorders." Lars Jørgensen et al., *Benefits and Harms of the Human Papillomavirus (HPV) Vaccines: Systemic Review with Meta-Analyses of Trial Data from Clinical Study Reports*, 9 SYSTEMATIC REVIEWS 43 (February 2020).

209.    In addition, Jørgensen and his co-authors observed that, in reanalyzing the association between HPV vaccines and one specific autoimmune disease, POTS, the HPV vaccines were associated with a nearly two-fold increased risk of symptoms associated with POTS. *Id.*

210.    Other researchers, including Tomljenovic and Shaw, who have closely looked into Gardasil, have opined that risks from the Gardasil vaccine seem to significantly outweigh the as yet unproven long-term benefits. In their view, vaccination is unjustified if the vaccine carries any substantial risk, let alone a risk of death, because healthy teenagers face an almost zero percent risk of death from cervical cancer.

**J.    Merck has Concealed the Fact that Gardasil Increases the Risk of Fertility Problems**

211.    Merck has never tested the impact of the Gardasil vaccines on human fertility.

212.    Nevertheless, study volunteers reported devastating impacts on human fertility during combined trials, offering substantial evidence that the vaccine may be causing widespread impacts on human fertility, including increases in miscarriage, birth defects, premature ovarian failure and premature menopause in girls and young women.

213.    One of the serious adverse events emerging in vaccinated girls and teens, is premature ovarian failure. *See, e.g.*, D. T. Little and H. R. Ward, *Adolescent Premature Ovarian Insufficiency Following Human Papillomavirus Vaccination: A Case Series Seen in General Practice*, JOURNAL OF INVESTIGATIVE MEDICINE HIGH IMPACT, Case Reports 1-12 (Oct.-Dec. 2014); D. T. Little and H. R. Ward, *Premature ovarian failure 3 years after menarche in a 16-*

*year-old girl following human papillomavirus vaccination*, BMJ CASE REPORTS (Sept. 30, 2012).

214.    Premature ovarian failure can occur after aluminum destroys the maturation process of the eggs in the ovaries.

215.    Fertility has plummeted among American women following the 2006 mass introduction of the Gardasil vaccine. This is most evident in teen pregnancy statistics where numbers have more than halved since 2007.

216.    The total fertility rate for the United States in 2017 continued to dip below what is needed for the population to replace itself, according to a report by the National Center of Health Statistics issued in January 2019, and the rate for women 15 to 44 fell another 2 percent between 2017 and 2018.

### K.    There were an Increased Number of Deaths in the Gardasil Studies

217.    Merck's own preliminary studies predicted that Gardasil would kill and injure far more Americans than the HPV virus, prior to the introduction of the vaccine.

218.    The average death rate in young women in the U.S. general population is 4.37 per 10,000. *See* Brady E. Hamilton et al., "Births: Provisional Data for 2016," *Vital Statistics Rapid Release, Report No. 002*, June 2017.

219.    The Gardasil pooled group had a death rate of 8.5 per 10,000, or almost double the background rate in the U.S.



Background CDC rate 4.37 source: National Vital Statistics Report Vol. 53 2002 page 24.[37]
Gardasil rate 8.5: 10/11,778. AAHS control rate 7.2: 7/9,680[38]
Cervical cancer mortality: 2.3 per 100,000 source: National Cancer Institute SEER Cancer Statistics Review 2015[39]

220.    When Merck added in deaths from belated clinical trials, the death rate jumped to

13.3 per 10,000 (21 deaths out of 15,706).

221.    Merck dismissed all deaths as coincidences.

222.    The total number of deaths was 21 in the HPV vaccine group and 19 in the

comparator (AAHS) groups.

223.    The death rate among vaccine recipients was 13.3 per 10,000, or 133 per 100,000

(21/15,706).

224.    To put this in perspective, the death rate from cervical cancer in the United States

is 2.3 per 100,000 women.  This means that, according to Merck's own data, a girl is 58 times

more likely to die from Gardasil than from cervical cancer.

### L.    Post-Marketing Injuries -- The Raft of Injuries Seen in Merck's Clinical Trials Has Now Become a Population-Wide Chronic Disease Epidemic

225.    By 2010, reports coming in from all over the world linked the Gardasil vaccine to

troubling symptoms.

226.    Many Gardasil survivors will have lifelong handicaps.

227.    The severe adverse events from the Gardasil vaccination, seen since its

widespread distribution, are similar to those injuries that Merck covered up during its clinical trials. They include autoimmune diseases, deaths, premature ovarian failures, reproductive problems, infertility, cervical cancer, sudden collapse, seizures, multiple sclerosis, strokes, heart palpitations, chronic muscle pain, complex regional pain syndrome, and weakness.

228.     Frequently reported injuries from HPV vaccines include disturbances of consciousness, systemic pain (headache, myalgia, arthralgia, back pain), motor dysfunction (paralysis, muscular weightiness, involuntary movements), sensory disturbances (numbness), autonomic symptoms (hypotension, tachycardia, nausea, vomiting, diarrhea), respiratory dysfunction (dyspnea, asthma), endocrine disorders (menstrual disorder, hypermenorrhea), hypersensitivity to light, heart palpitations, migraine headaches, dizziness, cognitive deficits, personality changes, vision loss, joint aches, brain inflammation, chronic fatigue, death, and severe juvenile rheumatoid arthritis.

229.     As of December 2024, there were more than 77,446 Gardasil adverse events reported to the FDA's Vaccine Adverse Event Reporting System ("VAERS") since 2006.

230.     Moreover, studies have shown that only approximately one percent of adverse events are actually reported to FDA's voluntary reporting systems, thus, the true number of Gardasil adverse events in the United States may be as high as 7.7 million incidents.

231.     Gardasil is used widely in the international market, and this global experience has likewise confirmed that the vaccine causes serious adverse events with minimal proven benefit.

232.     According to the WHO's Adverse Event Databases, there have been more than 100,000 serious adverse events associated with Gardasil, outside the Americas.[3]

   **i.**   **In Light of Gardasil's Serious and Debilitating Adverse Events, the**

---

[3] *See* WHO Vigibase database, keyword Gardasil: http://www.vigiaccess.org.

**Japanese Government Rescinded Its Recommendation that Girls
Receive Gardasil**

233.     Japan's health ministry discovered adverse events reported after Gardasil were many times higher than other vaccines on the recommended schedule. These included seizures, severe headaches, partial paralysis, and complex regional pain syndrome. See Hirokuni Beppu et al., *Lessons Learnt in Japan From Adverse Reactions to the HPV Vaccine: A Medical Ethics Perspective*, 2 INDIAN J MED ETHICS 82 (April-June 2017).

234.     Japanese researchers found that adverse events rate of the HPV vaccine was as high as 9 percent, and that pregnant women injected with the vaccine aborted or miscarried 30 percent of their babies.[4]

235.     Japan withdrew its recommendation for Gardasil three months after it had added the vaccine to the immunization schedule, due to "an undeniable causal relationship between persistent pain and the vaccination."

236.     In 2015, the Japanese Association of Medical Sciences issued official guidelines for managing Gardasil injuries post-vaccination.

237.     That same year, the Japanese Health Ministry published a list of medical institutions where staff were especially trained to treat patients who had sustained Gardasil-induced injuries and launched a series of special clinics to evaluate and treat illnesses caused by the Gardasil vaccines.

238.     The president of the Japanese Association of Medical Sciences stated that there was no proof that the vaccines prevent cancer.

      **ii.**      **Denmark Has Opened Specialized Clinics Specifically Focused on
Treating Gardasil-Induced Injuries, Including Gardasil-Induced**

---

[4] *See* Ministry of Health, Labour and Welfare, Transcript "The Public Hearing on Adverse Events following HPV vaccine in Japan," February 26, 2014.

**Autoimmune Diseases**

239.    In March 2015, Denmark announced the opening of five new "HPV clinics" to treat children injured by Gardasil vaccines. Over 1,300 cases flooded the HPV clinics shortly after opening. *See* Zosia Chustecka, *Chronic Symptoms After HPV Vaccination: Danes Start Study*, MEDSCAPE (November 13, 2015).

### iii.    India Halted Gardasil Trials and Accused Merck of Corruption After the Death of Several Young Girls Who were Participants in the Trial

240.    Seven girls died in the Gardasil trials in India coordinated by Merck and the Gates Foundation. A report by the Indian Parliament accused Merck of conducting "a well-planned scheme to commercially exploit" the nation's poverty and powerlessness and lack of education in rural India in order to push Gardasil.[5]

241.    The report alleges that Merck (through PATH, to whom it supplied vaccines) and the Gates Foundation resorted to subterfuge that jeopardized the health and well-being of thousands of vulnerable Indian children. The parliamentary report makes clear that the clinical trials could not have occurred without Merck corrupting India's leading health organizations. *Id.*

242.    The Report accused PATH, which was in collaboration with Merck, of lying to illiterate tribal girls to obtain informed consent, widespread forging of consent forms by Merck operatives, offering financial inducements to participate, and providing grossly inadequate information about potential risks. *Id.*

243.    Many of the participants suffered adverse events including loss of menstrual cycles and psychological changes like depression and anxiety. According to the report: PATH's "sole aim has to been to promote the commercial interests of HPV vaccine manufacturers, who

---

[5] *See* 72nd Report on the *Alleged Irregularities in the Conduct of Studies Using Human Papilloma Virus (HPV) Vaccine by Programme for Appropriate Technology in Health (PATH) in India* (August 2013).

would have reaped a windfall of profits had they been successful in getting the HPV vaccine included in the universal immunization program of the country... This [conduct] is a clear-cut violation of the human rights of these girls and adolescents." *Id*.

244. In April 2017, the Indian government blocked the Gates Foundation from further funding of the Public Health Foundation of India and other non-governmental organizations, effectively barring them from influencing India's national vaccine program. *See* Nida Najar, *India's Ban on Foreign Money for Health Group Hits Gates Foundation*, THE NEW YORK TIMES, April 20, 2017.

## M. Merck's Fraud Has Paid Off Handsomely Resulting in Over $6 Billion in Gardasil Sales Annually

245. Merck's corruption and fraud in researching, testing, labeling, and promoting Gardasil have paid off handsomely.

246. Presently, two doses of Gardasil 9 typically cost about $450, plus the cost of two office visits.

247. By comparison, the cost of the DTaP vaccine is about $25 per dose.

248. The HPV vaccine is the most expensive vaccine on the market.

249. In 2022, Merck made $6.9 billion in worldwide revenues from Gardasil.

250. Gardasil is Merck's most lucrative vaccine and its third-highest selling product.

251. Gardasil is crucial to Merck's overall financial health. Merck identifies Gardasil as one of its "key products," meaning that any change in Gardasil's cash flow affects the corporation as a whole.

252. Merck's 10-K financial reports note that, for example, the discovery of a previously unknown side effect, or the removal of Gardasil from the market, would hurt Merck's bottom line.

**III. Julia Obermier Sustained Serious Autoimmune, Autonomic, and Neurological Injuries as A Result of Her Gardasil Injections**

253.    Plaintiff was 23 years old when she received her first and second dosages of Gardasil. Plaintiff was 24 years old when she received her third dosage of Gardasil.

254.    Plaintiff agreed to receive Gardasil after being convinced by Merck's marketing that Gardasil is very safe and prevents cancer. Plaintiff relied upon Merck's ubiquitous representations concerning the safety and efficacy of the Gardasil vaccine in consenting to her Gardasil vaccinations.

255.    Plaintiff's health care provider, Sara Weiderholt, M.D., in Rochester, Minnesota recommended that Plaintiff receive the Gardasil vaccine, which was touted as a safe and effective vaccine for preventing cervical cancer. Upon information and belief, Plaintiff's doctor, Sara Weiderholt, M.D., read and relied upon information from Merck, through its labeling and/or marketing, that Gardasil was safe and effective.

256.    In light of Plaintiff's doctor's recommendations, as well as Merck's relentless marketing and advertising messages, to which Plaintiff had been exposed concerning the safety and efficacy of Gardasil, Plaintiff consented to being injected with Gardasil.

257.    After her third Gardasil vaccine, Plaintiff experienced an onset of extreme allergies, rapid heart rate, fatigue, abnormal perspiration without exercise, constant sweating, extreme thirst, joint stiffness, abnormal menstruation, muscle fatigue, weight gain, dizziness, and daily coughing and wheezing. She was prescribed an inhaler which she used five to ten times a day, but with little to no relief. Her daily fatigue caused excessive sleeping during the day.

258.    After multiple tests and appointments, Plaintiff was diagnosed with chronic fatigue and acute allergies (which can develop after changes in the immune system).

259.    Plaintiff was later diagnosed with epithelial cell abnormality, atypical squamous

cell of undetermined significance (abnormal cells in the tissue that lines the outer part of the cervix). She experiences daily pain, fatigue, joint stiffness, and abdominal bloating.

260. As a result of her post-Gardasil symptoms, Plaintiff has been unable to engage in activities that a normal young person would enjoy. Plaintiff's symptoms are ongoing and will require treatment for the foreseeable future and possibly the rest of her life.

261. Based upon her chronic and severe post-Gardasil symptoms, Plaintiff has been diagnosed with various medical conditions, including but not limited to, chronic fatigue, acute allergies, epithelial cell abnormality, atypical squamous cell of undetermined significance, and POTS-like symptoms.

262. The medical literature has documented other patients who, like Plaintiff, have suffered serious autoimmune, autonomic, menstrual, and neurological dysfunctions, and who experienced similar side effects as those Plaintiff has suffered. *See e.g.,* Wastilla et al., *Association Between Vaccination for Human Papillomavirus (HPV) and Autonomic Dysfunction and Menstrual Irregularities: A Self-Controlled Case Series Analysis*, DRUGS – REAL WORLD OUTCOMES (2025); Martínez-Lavín M., *Fibromyalgia-like illness in 2 girls after human papillomavirus vaccination* J CLIN RHEUMATOL (2014); Ryabkova VA et al., *Neuroimmunology: What Role for autoimmunity, Neuroinflammation, and Small Fiber Neuropathy in Fibromyalgia, Chronic Fatigue Syndrome, and Adverse Events after Human Papillomavirus Vaccination?* INT J MOL SCI (2019); Martínez-Lavín M., *HPV vaccination syndrome: A clinical mirage, or a new tragic fibromyalgia model*, RHEUMATOL CLIN (ENGL ED) (2018); Yaju Y et al., *Safety concerns with human papilloma virus immunization in Japan: Analysis and evaluation of Nagoya City's surveillance data for adverse events*, JPN J NURS SCI (2019); Ozawa et al., *Suspected Adverse Effects After Human Papillomavirus Vaccination: A Temporal Relationship Between Vaccine*

*Administration and the Appearance of Symptoms in Japan*, DRUG SAFETY (2017); E. Israeli et al., *Adjuvants and Autoimmunity*, LUPUS (2009); Kanduc, *Quantifying the Possible Cross-Reactivity Risk of an HPV16 Vaccine*, J EXPERIMENTAL THERAPEUTICS AND ONCOLOGY (2009); Kanduc, *Potential Cross-Reactivity Between HPV16 L1 Protein and Sudden Death Associated Antigens*, J EXPERIMENTAL THERAPEUTICS AND ONCOLOGY (2011); Segal et al, *Vaccine-induced autoimmunity: the role of molecular mimicry and immune crossreaction*, CELLULAR & MOLECULAR IMMUNOLOGY (2018); Rinaldi et al., *Anti-Saccharomyces Cerevisiae Autoantibodies in Autoimmune Diseases: from Bread Baking to Autoimmunity*, CLINICAL REVIEWS IN ALLERGY AND IMMUNOLOGY (2013); Kinoshita et al., *Peripheral Sympathetic Nerve Dysfunction in Adolescent Japanese Girls Following Immunization With Human Papillomavirus Vaccine*, INTERNAL MEDICINE (2014); Shaw et al., *Aluminum-Induced Entropy in Biological Systems: Implications for Neurological Disease*, JOURNAL OF TOXICOLOGY (2014); Manuel Martinez-Lavin et al., *HPV Vaccination Syndrome. A Questionnaire Based Study*, J CLINICAL RHEUMATOLOGY (2015); Brinth et al., *Is Chronic Fatigue Syndrome/Myalgic Encephalomyelitis a Relevant Diagnosis in Patients with Suspected Side Effects to Human Papilloma Virus Vaccine*, INT J OF VACCINE & VACCINATION (2015); Schofield et al., *Autoimmunity, Autonomic Neuropathy, and HPV Vaccination, A Vulnerable Subpopulation*, CLINICAL PEDIATRICS (2017); Chandler et al., *Current Safety Concerns With Human Papillomavirus Vaccine: A Cluster Analysis of Reports in VigiBase*, DRUG SAFETY (2017); Jørgensen et al., *Benefits and Harms of the Human Papillomavirus (HPV) Vaccines: Systemic Review with Meta-Analyses of Trial Data from Clinical Study Reports*, SYSTEMATIC REVIEWS (2020); Blitshetyn, *Human Papilloma Virus (HPV) Vaccine Safety Concerning POTS, CRPS and Related Conditions*, CLINICAL AUTONOMIC RESEARCH (2019); Ikeda et al. *Suspected adverse effects after human papillomavirus*

*vaccination: a temporal relationship* IMMUNOLOGIC RESEARCH (2018); Mehlsen et al. *Autoimmunity in patients reporting long-term complications after exposure to human papilloma virus vaccination*, JOURNAL OF AUTOIMMUNITY (2022); Hviid et al., *Association between quadrivalent human papillomavirus vaccination and selected syndromes with autonomic dysfunction,* BMJ (2020) (1.32 elevated risk of all syndromes combined, authors admitted an "increased risk of up to 32% cannot be formally excluded ...."); Chao et al., *Surveillance of autoimmune conditions following routine use of quadrivalent human papillomavirus vaccine,* J INT MED (2011) (Hashimoto's disease, and autoimmune disease, was statistically significantly elevated with a IRR of 1.29 (95% CI; 1.08 - 1.56)); Rosillon, D. et al. *Meta-analysis of the risk of autoimmune thyroiditis, Guillain-Barré syndrome, and inflammatory bowel disease following vaccination with AS04-adjuvanted human papillomavirus 16/18 vaccine,* PHARMACOEPIDEMIOL DRUG SAF (2020); Xie Q. et al. *Subacute Thyroiditis Following HPV Vaccination: A Case Report,* SICHUAN DA XUE XUE BAO YI XUE BAN (2021); Hsiao JY et al., *Subacute thyroiditis following influenza vaccine (Vaxigrip) in a young female,* KAOHSIUNG J MED SCI (2006); Amheim-Dahlstrom L et al. *Autoimmune, neurological, and venous thromboembolic adverse events after immunization of adolescent girls with quadrivalent human papilloma virus vaccine in Denmark and Sweden: cohort study,* BMJ (2013) (Exposure to quadrivalent HPV vaccine was significantly associated with Behcet's syndrome (rate ratio 3.37, (95% CI: 1 .05 -10.80), Raynaud's disease rate ratio 1.67, (95% CI: 1.14-2.44), and type 1 diabetes, rate ratio 1.29 (95% CI: 1.03 -1.62); Langer-Gould et al., *Vaccines and the risk of Multiple Sclerosis and other Central Nervous System Demyelinating Diseases,* JAMA NEUROLOGY (2014) (Vaccination of any type was associated with an increased risk of CNS ADS onset within the first 30 days after vaccination only in younger (less than 50 year) individuals (OR, 2.32; 95% CI, 1.18- 4.57);

Willame et al., *Risk of new onset autoimmune disease in 9-to 25-old women exposed to human papilloma virus -16/18 ASO4-adjuvanted vaccine in the United Kingdom,* HUMAN VACCINES & IMMUNOTHERAPEUTICS (2016) (Autoimmune thyroiditis was confirmed in 15 patients (23.18 per 100,000 patient years) of HPV vaccinated patients and in four (6.17 per 100,000 patient years) in unexposed historical female controls. This was highly statistically significant with an incidence rate ratio (IRR) of 3.75 (95% CI: 1.25- 11.31). In other words, vaccinated females were 375% more likely to develop autoimmune thyroiditis as compared to unvaccinated controls); Miranda S, Chaignot C, Collon C et al. *On the relationship between human vaccination and risk of autoimmune diseases: a large cohort study of over 2 million young girls in France,* VACCINE (2017) (HPV vaccination was associated with significantly increased risks of GBS and IBD: adjusted hazard ratio of 3.78 [95% CI: 1.79 - 7.98] (P < 0.001) and 1.18 [95% CI: 1.01-1.38] (P = 0.032) respectively and a strong and robust association was found between HPV vaccination and GBS which was particularly marked in the first two months following vaccination. A significant but weak association with IBD was found. This was the largest study evaluating the risk of AID after HPV vaccination, thus allowing the assessment of rare disease risks not investigated previously); He, N. Leng et al. *Systemic lupus erythematosus following human papillomavirus vaccination: A case-based review,* INT J RHEUM DIS (2022); Segal et al., *HPV and systemic lupus erythematosus: a mosaic of potential crossreactions* IMMUNOL RES (2017); Segal et al., *Human papilloma virus and lupus: the virus, the vaccine and the disease,* CURR OPIN RHEUMATOL (2017); Soldevilla HF et al. *Systemic lupus erythematosus following HPV immunization or infection?* LUPUS (2012); Hirokuni Beppu et al., *Lessons Learnt in Japan From Adverse Reactions to the HPV Vaccine: A Medical Ethics Perspective,* INDIAN J MED ETHICS (2017); Deirdre Little et al., *Premature ovarian failure 3 years after menarche in a 16-year-old*

*girl following human papillomavirus vaccination*, BRIT. MED. J. CASE REPORTS (2012); Serena Colafrancesco et al., *Human Papilloma Virus Vaccine and Primary Ovarian Failure: Another Facet of the Autoimmune Inflammatory Syndrome Induced by Adjuvants*, AM. J. REPRODUCTIVE IMMUNOLOGY (2013).

263. Plaintiff contends that her Gardasil injections caused her to develop serious and debilitating autoimmune, autonomic, menstrual, and neurological, injuries, including but not limited to chronic fatigue, acute allergies, and POTS-like symptoms, as well as a constellation of adverse symptoms, complications, injuries, and other adverse events, many of which are alleged herein and all of which were caused by Gardasil or otherwise linked to her Gardasil-induced autoimmune disorder.

### N. Plaintiff Has Complied with the National Vaccine Injury Compensation Program Requirements

264. Pursuant to Section 300aa-11(a) of the National Vaccine Injury Compensation Program (NVICP): "No person may bring a civil action for damages ...... against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury ... associated with the administration of a vaccine ....... unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury ... and (I) the United Stated Court of Federal Claims has issued a judgment under section 300aa-12 of this title on such petition and (II) such person elects under section 300aa-21(a) to file such an action." *See* 42 U.S.C. §§ 300aa–11(a)(2)(A).

265. Title 42, Section 300aa-16 (c) further states: "If a petition is filed under section 300aa-11 of this title for a vaccine-related injury or death, limitations of actions under State law shall be stayed with respect to a civil action brought for such injury or death for the period beginning on the date the Petition is filed and ending on the date...an election is made under

section 300aa–21(a) of this title to file the civil action ...” *See* 42 U.S.C. §§ 300aa–16(c).

266.    Plaintiff's medical provider did not provide Plaintiff with the Vaccine Information Statement required by the National Vaccine Childhood Injury Act, NCVIA – 42 U.S.C. § 300aa-26; see also National Vaccine Injury Compensation Program: Addition of Meningococcal and Human Papillomavirus (HPV) Vaccines to the Vaccine Injury Table, 72 Fed. Reg. 76 (Apr.20, 2007). Therefore, Plaintiff was unaware of any available remedy for an adverse reaction to a vaccine or that the Vaccine Court program even existed. Plaintiff first learned of a link between her symptoms and Gardasil in the summer of 2023.

267.    In full compliance with the aforementioned federal law, Plaintiff duly filed her petition with the U.S. Court of Federal Claims seeking compensation for her Gardasil vaccine-related injuries under the NVICP. A judgement thereon was rendered on or about March 18, 2025, and Plaintiff duly filed her election to file a civil action on July 11, 2025.

268.    Having complied with NVICP administrative procedure and having duly filed her election to proceed with a civil action, Plaintiff hereby timely initiates the instant action against Merck, the manufacturer and promoter of the Gardasil vaccines which caused her debilitating injuries. Through this civil action, Plaintiff seeks to hold Merck accountable for its negligent, reckless, and fraudulent conduct and she seeks full compensation from Merck for the physical and emotional injuries and harms she sustained as a result of Gardasil.

## CAUSES OF ACTION

## COUNT ONE

## NEGLIGENCE

269.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

270. At all times relevant to this action, Merck had a duty to exercise reasonable care to ensure that Gardasil was not unreasonably dangerous to all persons who might be injected with Gardasil.

271. At all times relevant to this action, Merck had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of Gardasil.

272. At all times relevant to this action, Merck knew or reasonably should have known that Gardasil was unreasonably dangerous when used as directed, because Gardasil exposes those injected with it to an increased risk of injuries, including but not limited to:

      a.     autoimmune and autonomic diseases;

      b.     fertility problems;

      c.     neurological diseases; and

      d.     death.

273. Based on what Merck knew or reasonably should have known as described above, Merck breached its duty of care and was otherwise negligent in one or more of the following particulars:

      a.     failing to conduct adequate pre- and post-market testing and studies;

      b.     failing to adequately disclose the results of its studies including the lack of efficacy and risk of harm associated with Gardasil;

      c.     failing to conduct necessary tests on the safety of the components of Gardasil;

      d.     failing to test Gardasil against a true inert placebo and testing it with a placebo that included the aluminum adjuvant AAHS;

e.　　failing to conduct tests for the targeted population which included pre-teen girls (and boys) between the ages of nine and twelve;

f.　　not using the commercial dosage of the adjuvant AAHS and other ingredients in key clinical trials;

g.　　using restrictive exclusionary criteria in the clinical study patient population (including, for example, excluding anyone with a prior abnormal Pap test, those with a history of immunological or nervous system disorders, or those who allergic to aluminum or other ingredients) while knowing Gardasil would be provided to persons within those excluded categories;

h.　　failing to disclose that Gardasil is not effective when provided to persons who have tested positive for HPV;

i.　　failing to disclose that the safest and most effective means of preventing cervical cancer is Pap testing, not Gardasil;

j.　　failing to disclose to patients and the medical community in Gardasil labeling and marketing that Gardasil contains HPV L1-DNA fragments which can act as Toll-Like Receptor 9 (TLR9) agonists that can contribute to autoimmune injuries; and

k.　　failing to make changes to Gardasil's labeling when Merck knew or should have known the labeling did not accurately disclose Gardasil's safety or lack of efficacy.

274.　　Merck's negligent acts as alleged above were a substantial contributing cause of the injuries and damages suffered by Plaintiffs.

275.　　The injuries and damages suffered by Plaintiffs were the reasonably foreseeable

results of Merck's negligence.

276.    Because of Meck's failure to disclose and/or concealment of the true risks and lack of efficacy of Gardasil, Plaintiff's healthcare providers could not have reasonably discovered Gardasil's lack of safety and efficacy before or at the time they recommended and provided Gardasil to Plaintiff and could not have relayed the true risks and lack of efficacy to Plaintiff.

277.    Had Merck performed or disclosed the tests and studies necessary to determine the true safety and efficacy of Gardasil, Plaintiff would have declined to be injected with Gardasil, and would not have been injured by Gardasil.

278.    Had Merck performed or disclosed the tests and studies necessary to determine the true safety and efficacy of Gardasil, Plaintiff's healthcare providers would not have administered Gardasil to Plaintiff, and Plaintiff would not have been exposed to Gardasil and would not have been injured by Gardasil.

279.    As a direct and proximate cause of Merck's negligence, Plaintiff suffered the injuries described in this complaint.

280.    WHEREFORE, Plaintiff requests that the Court enter judgment in her favor for compensatory damages and punitive damages, together with interest, and costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT TWO

## STRICT LIABILITY

## (FAILURE TO WARN)

281.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if

fully set forth herein, and further alleges:

282. Plaintiff brings this strict liability claim against Merck for failure to warn.

283. At all times relevant to this litigation, Merck exercised ultimate control and supervision over all aspects of Gardasil's testing, production, labeling and distribution.

284. Merck promoted Gardasil and released it into the stream of commerce, and, Merck, therefore, had a duty at all times to accurately warn of the risks associated with the reasonably foreseeable uses of Gardasil and to accurately disclose Gardasil's safety and efficacy.

285. At all times relevant this litigation, Merck knew or should have known of the unreasonable risks of harm associated with exposure to Gardasil.

286. At all times relevant to this litigation, Merck failed to accurately disclose the efficacy and risks of harm of exposure to Gardasil including but not limited to increased risks for:

      a. autoimmune and autonomic diseases;

      b. fertility problems;

      c. neurological diseases; and

      d. death.

287. Plaintiff was injected with Gardasil without knowledge of its unreasonable dangerous and inefficacious characteristics.

288. Because of Meck's failure to disclose and/or concealment of the true risks and lack of efficacy of Gardasil, Plaintiff's healthcare providers could not have reasonably discovered Gardasil's lack of safety and efficacy before or at the time they recommended and provided Gardasil to Plaintiff and could not have relayed the true risks and lack of efficacy to Plaintiff.

289. Plaintiff could not reasonably have discovered the defects and risks associated with Gardasil before or at the time of her injections. Plaintiff relied upon the skill, superior knowledge, and judgment of Merck.

290. Had Plaintiff been informed of the true risks and of Gardasil, Plaintiff would not have consented to being injected with Gardasil.

291. As a result of Merck's failure to warn and false promotion, Gardasil is and was defective and unreasonably dangerous when it was injected into Plaintiff.

292. As a proximate result of Merck's failure to warn Plaintiff and Plaintiff's healthcare providers, Plaintiff has suffered and continues to suffer severe and permanent physical injuries, including pain and suffering. Plaintiff also has a substantial fear of suffering additional and ongoing harms, including but not limited to now being at an increased risk of cancer, and future symptoms and harms associated with her injuries caused by Gardasil.

293. As a direct and proximate result of her Gardasil-induced injuries, Plaintiff has suffered and continues to suffer economic losses, including considerable financial expenses for medical care and treatment, and diminished income capacity and she will continue to incur these losses and expenses in the future.

294. Merck's conduct, as described above, was oppressive, fraudulent, and malicious. Merck regularly risks the lives of teenagers, including Plaintiff, with full knowledge of the limited efficacy of Gardasil and the severe and sometimes fatal dangers of Gardasil. Merck has made conscious decisions to not warn or inform the unsuspecting public, including Plaintiff and her medical providers. Merck's conduct, including its false promotion of Gardasil and its failure to issue appropriate warnings concerning the severe risks of Gardasil, created a substantial risk of significant harm to children, teenagers, and patients who were being injected with Gardasil,

and therefore warrants an award of punitive damages.

295.    WHEREFORE, Plaintiff requests that the Court enter judgment in her favor for all compensatory and punitive damages, together with interest, and costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**COUNT THREE**

**STRICT LIABILITY**

**(MANUFACTURING DEFECT)**

296.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

297.    Plaintiff brings this strict liability claim against Merck for manufacturing defect. At all times relevant to this litigation, Merck engaged in the business of researching, testing, developing, manufacturing, marketing, selling, distributing, and promoting Gardasil, which is defective and unreasonably dangerous to consumers, including Plaintiff, because of manufacturing defects, which patients, including Plaintiff and her medical providers did not expect.

A. Legal Standards for Manufacturing Defect:

298.    Under legal principles governing product liability, a manufacturing defect occurs when a product deviates from its intended design or specifications during the manufacturing process, rendering it unreasonably dangerous to consumers. In the case of Gardasil, Merck's failure to comply with approved manufacturing specifications by only estimating and failing to quantify the actual amount of HPV L1 Protein DNA in Gardasil vials and failing to convey the HPV L1 Protein DNA's immunogenicity acting as a TLR 9 agonist and therefore an additional

60

adjuvant that contributes to inducing autoimmune conditions constitutes a clear manufacturing defect.

B. Intended Design:

299.    Gardasil was designed and marketed as a vaccine to prevent certain strains of HPV, with the primary goal of reducing the risk of cervical cancer and other related diseases.

300.    The intended formulation of Gardasil did not include the presence of HPV LI-DNA fragments or any undisclosed adjuvants that could enhance its potency.

301.    The presence of concealed HPV LI-DNA fragments therefore deviates from the intended design and performance of the vaccine, warranting liability for the harm suffered by consumers.

C. Concealment of Ingredients:

302.    Manufacturing defects occur when a product deviates from its intended design due to errors or omissions during the production process.

303.    Merck's deliberate failure to quantify the actual amount and immunogenicity of HPV LI-Protein DNA fragments, using HPV L1-Protein fragments as an unlabeled and untested additional adjuvant was concealed from physicians and the public, constituting a manufacturing defect. These repeated acts of concealing Gardasil ingredients from both physicians and the public flagrantly violate federal regulations governing the production and marketing of biologic products.

304.    The FD&C Act and its implementing regulations require manufacturers to obtain FDA approval before introducing new adjuvants or ingredients into vaccines, ensuring they are safe and effective for their intended use. Merck's failure to seek FDA approval for the use of HPV LI-Protein DNA fragments as an adjuvant in Gardasil further underscores the company's

disregard for regulatory requirements and consumer safety.

305.     Thus, Merck's failure to accurately disclose all ingredients in Gardasil resulted in a product that did not conform to its intended design, thus constituting a manufacturing defect.

D. Unreasonable Danger to Consumers:

306.     Gardasil vaccines injected into Plaintiff were defective and unreasonably dangerous because they failed to comply with manufacturing specifications required by the governing manufacturing protocols and also required by the regulatory agencies, including but not limited to the FDA, by among other things, containing ingredients and toxins that were not disclosed in the FDA-approved specifications and/or otherwise not disclosed in the package insert. Specifically, Gardasil's inclusion of undisclosed HPV L1-Protein DNA fragments, which function as TLR9 agonists, rendered the vaccine defective and unreasonably dangerous, resulting in harm to the Plaintiff. The presence of unlabeled HPV L1-Protein DNA fragments in Gardasil significantly increases the vaccine's potency and immunogenicity, introducing unforeseen risks to physicians and consumers. These fragments act as TLR9 agonists, stimulating immune responses and potentially exacerbating adverse reactions. The enhanced potency, unquantified actual amount and immunogenicity of these ingredients render Gardasil unreasonably dangerous, as it poses a greater risk of harm than intended and conveyed by the manufacturer. For example, the Gardasil injected into Plaintiff was defective and unreasonably dangerous because it failed to comply with the approved manufacturing specifications, by containing dangerous and unquantified amounts of HPV L1-DNA fragments, and these DNA fragments act as Toll-Like Receptor 9 (TLR9) agonists, further adjuvanting the vaccine and making it more potent, immunogenic and dangerous than intended. Further, as stated above, the concealment of HPV LI-DNA fragments in Gardasil from physicians and the public by not

including the presence, amount, immunogenic activity and its contribution to inducing autoimmune conditions in Gardasil's package inserts or marketing undermined the integrity and safety of the product. Plaintiff and her medical providers could not reasonably have discovered the defects, including the manufacturing defects, and risks associated with Gardasil before or at the time of her injections. Plaintiff relied upon the skill, superior knowledge, and judgment of Merck, and Merck is liable to Plaintiff for injuries caused as a result of its manufacturing defects.

E. Causation:

307.     The defects in Merck's Gardasil vaccine were substantial and contributing factors in causing Plaintiff's injuries, and, but for Merck's Gardasil's defects, Plaintiff would not have sustained the injuries she has sustained to date, and would not have been exposed to the additional prospective risks associated with Gardasil.

308.     As a proximate result of Merck's wrongful acts and Gardasil's manufacturing defects, Plaintiff has suffered and continues to suffer severe and permanent physical injuries and permanent emotional injuries, including pain and suffering. Plaintiff also has a substantial fear of suffering additional and ongoing harms, including but not limited to now being at an increased risk of cancer, and future symptoms and harms associated with her autoimmune disease and other injuries caused by Gardasil.

309.     As a direct and proximate result of her Gardasil-induced injuries, Plaintiff has suffered and continues to suffer economic losses, including considerable financial expenses for medical care and treatment, and diminished income capacity, and she will continue to incur these losses and expenses in the future.

310.     Merck's conduct, as described above, was oppressive, fraudulent, and malicious.

Merck regularly risks the lives of patients, including Plaintiff, with full knowledge of the limited efficacy of Gardasil and the severe and sometimes fatal dangers of Gardasil. Merck has made conscious decisions to not warn, or inform the unsuspecting public, including Plaintiff, and her medical providers. Merck's conduct, including its false promotion of Gardasil and its failure to issue appropriate warnings concerning the severe risks of Gardasil, created a substantial risk of significant harm to children and patients who were being injected with Gardasil. By concealing the presence, amount and immunogenicity of HPV LI-Protein DNA fragments in Gardasil from physicians and consumers, Merck has produced a vaccine that deviates from its intended design and poses an unreasonable risk of harm to consumers and, therefore, warrants an award of punitive damages.

311. WHEREFORE, Plaintiff requests that the Court enter judgment in her favor for compensatory and punitive damages, together with interest, and costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FOUR

## BREACH OF EXPRESS WARRANTY

312. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

313. Merck engaged in the business of testing, researching, manufacturing, labeling, marketing, selling, distributing, and promoting Gardasil, which is defective and unreasonably dangerous to consumers, including Plaintiff.

314. At all times relevant to this litigation, Merck expressly warranted through statements made in its Gardasil label, publications, television advertisements, billboards, print

advertisements, online advertisements and website, and other written materials intended for consumers, patients, parents of minor-aged patients, medical providers (including Plaintiff's doctor, Sara Weiderholt, M.D.), and the general public, that Gardasil was safe and effective at preventing cancer. Merck's representations amount to an express warranty that Gardasil will conform to those representations.

315.    These express representations failed to include all risks that Merck knew or should have known were associated with Gardasil, including but not limited to increased risk for: cancer; autoimmune and autonomic diseases; fertility problems; neurological diseases; and death.

316.    Merck also falsely and expressly represented that Gardasil was "effective" in preventing cancer and that anyone who was vaccinated with Gardasil would be "one less" person with cancer when Merck knew or should have known this was not accurate.

317.    The representations about Gardasil, as set forth herein, were affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

318.    Merck breached these warranties because, among other things, Gardasil is ineffective at preventing cancer and is associated with myriad risks, including, but not limited to, the risk of autoimmune, autonomic, and neurological injuries, the risk of developing cervical cancer, and the risk of fertility problems. Specifically, Merck breached the warranties in the following ways:

> a)    Representing to patients and the medical community, including Plaintiff, and upon information and belief, Plaintiff's doctor, Sara Weiderholt,

M.D., that Gardasil is effective in preventing cancer, including anal and cervical cancer, when Merck knew that contrary to these representations (i) no clinical studies were performed to test if Gardasil prevents cancer; (ii) the clinical studies confirmed that Gardasil is indeed ineffective when used in patients who have previously been exposed to HPV, and that Gardasil actually increases the risk of cancer in a patient who has been previously exposed to HPV; and (iii) there are safer and more effective methods of monitoring for and attempting to prevent cervical or anal cancer, including but not limited to regular testing, such as regular Pap smears for cervical cancer, and monitoring for anal cancer.

b) Representing to patients and the medical community, including Plaintiff, and, upon information and belief, Plaintiff's doctor, Sara Weiderholt, M.D., that Gardasil is safe, when in reality, Gardasil causes and presents serious risks of cancer, autoimmune, autonomic, and neurological injuries, and cancer;

319. Merck had sole access to material facts concerning the nature of the risks and defects associated with Gardasil, and Merck knew that persons such as Plaintiff could not have reasonably discovered the truth about the inefficacies and serious risks associated with Gardasil.

320. Plaintiff's doctor, Sara Weiderholt, M.D., relied on the representations Merck made in the Gardasil's labeling and/or representations made in Gardasil's marketing and advertising materials.

321. Plaintiff had no knowledge of the falsity or incompleteness of Merck's representations concerning Gardasil.

322. Plaintiff was exposed to and relied upon the ubiquitous promotional material and representations Merck made in its marketing materials concerning the safety and efficacy of Gardasil, including: that Gardasil prevents cervical and anal cancer and these cancers are prevalent (even though children rarely get cervical or anal cancer and Pap tests are the best frontline defense in detecting and fighting cervical cancer); and that Gardasil is perfectly safe. Had Merck not engaged in disease mongering and deception in these advertisements but instead had informed Plaintiff about the truth about the serious risks of Gardasil and its lack of efficacy, she would never have consented to receiving Gardasil, had she been adequately informed about the questionable efficacy and serious risks associated with Gardasil.

323. As a proximate result of Merck's wrongful acts and breaches of warranties concerning the safety and efficacy of Gardasil, Plaintiff has suffered and continues to suffer severe and permanent physical injuries, and associated symptomology and has suffered severe and permanent emotional injuries, including pain and suffering. Plaintiff also has a substantial fear of suffering additional and ongoing harms, including but not limited to now being at an increased risk of cancer, and future symptoms and harms associated with her injuries caused by Gardasil.

324. As a direct and proximate result of her Gardasil-induced injuries, Plaintiff has suffered and continues to suffer economic losses, including considerable financial expenses for medical care and treatment, and diminished income capacity and she will continue to incur these losses and expenses in the future.

325. Merck's conduct, as described above, was oppressive, fraudulent, and malicious. Merck regularly risks the lives of patients, including Plaintiff, with full knowledge of the limited efficacy of Gardasil and the severe and sometimes fatal dangers of Gardasil. Merck has made

conscious decisions to not warn, or inform the unsuspecting public, including Plaintiff and her

doctor, Sara Weiderholt, M.D. Merck's conduct, including its false promotion of Gardasil and

its failure to issue appropriate warnings concerning the severe risks of Gardasil, created a

substantial risk of significant harm to children and patients who were being injected with

Gardasil, and therefore warrants an award of punitive damages.

326.    WHEREFORE, Plaintiff requests that the Court enter judgment in her favor for

compensatory and punitive damages, together with interest, and costs herein incurred, and all

such other and further relief as this Court deems just and proper. Plaintiff also demands a jury

trial on the issues contained herein.

## COUNT FIVE

## COMMON LAW FRAUD

327.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if

fully set forth herein, and further alleges:

328.    Merck is the researcher, manufacturer, labeler, and promoter of Gardasil.

329.    Merck marketed Gardasil for the benefit of patients, such as Plaintiff.

330.    Merck had a duty to deal honestly and truthfully with regulators, patients,

consumers and medical providers in its development, testing, marketing, promotion, and sale of

Gardasil.

331.    Merck's duty of care included providing accurate and complete information

concerning the efficacy and risks of Gardasil in its direct-to-consumer materials.

332.    At all times relevant to this litigation, Merck knew or should have known of the

dangers of Gardasil and the serious adverse events associated with Gardasil, including but not

limited to autoimmune diseases, autonomic diseases, fertility problems, increased risk of cancer,

and death.

333. At all times relevant to this litigation, Merck knew or should have known that its poorly conducted clinical trials and studies were insufficient to test the true long-term safety and efficacy of Gardasil.

334. At all times relevant to this litigation, Merck expressly represented through statements it made in its publications, ubiquitous television advertisements, billboards, print advertisements, online advertisements and website, and other written materials intended for consumers, patients, parents of minor-aged patients, medical providers and the general public, that Gardasil was safe and effective at preventing cancer.

335. By way of example, Merck's marketing material, including its "One Less" television and print advertisement campaign (including but not limited to Gardasil posters in medical facilities and doctors' offices), to which Plaintiff had been exposed, stated that Gardasil was safe, that Gardasil was effective in preventing cancer, that Gardasil was a "cervical cancer vaccine," and that any young person vaccinated with Gardasil would lead to "one less" person with cervical or anal cancer. The only safety warnings Merck provided in these marketing materials were that a patient could get pain, swelling or redness at injection site, fever, and/or nausea.

336. The ubiquitous nature of Gardasil's marketing campaign gave the inaccurate impression that cervical cancer was on the rise and more prevalent than it actually was, and that all good mothers vaccinate their children with the "cervical cancer vaccine."

337. The same promises of efficacy and limited and incomplete warnings Merck relayed in its direct-to-consumer advertising, were what Plaintiff's medical providers relayed to her when they recommended Gardasil – i.e., that if Plaintiff got vaccinated with Gardasil, it

would protect against HPV and prevent cervical cancer, and the only risks associated with Gardasil are soreness, redness, minor pain, and a headache may develop.

338.  Merck's representations were false, because in truth, Gardasil has not been proven to prevent cervical or anal cancer and is associated with myriad undisclosed risks, including, but not limited to, an increased risk of autoimmune, autonomic, neurological injuries, cancer, and other serious side effects. The false representations Merck made to patients, children, teenagers, the parents of children and teenagers, (including Plaintiff), and the medical community included:

a)      that Gardasil is effective in preventing cervical and anal cancer, when Merck knew that, contrary to these representations (i) no clinical studies were performed to test whether Gardasil prevents cancer; and (ii) the clinical studies confirmed that Gardasil is indeed ineffective when used in patients who have previously been exposed to HPV, and that Gardasil actually increases the risk of cervical cancer in any child or patient who has been previously exposed to HPV;

b)      that Gardasil is safe, when in reality, Gardasil causes and presents severe risks of cancer (including cervical cancer, the very cancer it is promoted as preventing), fertility problems, autoimmune, autonomic, and neurological injuries, and other grave illnesses;

c)      false advertising and disease mongering by scaring parents into believing that cervical and anal cancer were far more prevalent than they really were; that Gardasil prevented cervical and anal cancer; and that Gardasil only had risks of injection site pain and fever, when in reality none of these representations were true as cervical cancer rates were declining in

the United States due to Pap testing and Gardasil has not been shown to prevent cervical or anal cancer, and indeed some studies demonstrated that it actually increased the risk of cervical cancer; and Gardasil was linked to a host of serious, chronic and sometimes fatal diseases, including autoimmune diseases.

339. Plaintiff had been exposed to Merck's marketing material concerning Gardasil, including the aforementioned "One Less" marketing campaign and other print advertisements, and the representations made by Merck therein that Gardasil is effective at preventing cervical and anal cancer, that Gardasil is safe and that its only side-effects are essentially minor injection site pain and swelling, and the possible onset of a fever or nausea. Prior to providing consent to being injected with the Gardasil vaccine, Plaintiff was never informed that Gardasil is linked to a host of serious debilitating and chronic adverse events including, autoimmune, autonomic, menstrual, and neurological injuries, increased risk of cancer, and death.

340. Prior to providing consent to being injected with the Gardasil vaccine, Plaintiff was never informed that Merck had not conducted the proper testing necessary to demonstrate the efficacy and full safety of Gardasil.

341. Prior to providing consent to being injected with the Gardasil vaccine, Plaintiff was never informed that Merck had, as alleged herein, manipulated its clinical studies to mask and conceal the adverse events associated with Gardasil.

342. Prior to providing consent to being injected with the Gardasil vaccine, Plaintiff was never informed that the Gardasil clinical trials never established that Gardasil can prevent cervical or anal cancer, even though Merck in its promotional material falsely represented that Gardasil was a "cervical cancer vaccine" and that a patient who received Gardasil would result

in "one less" woman or man getting cancer.

343. These representations and other similar representations were made by Merck, including to Plaintiff, with the intent that patients and/or their parents would either seek out Gardasil from their medical providers or otherwise would provide their consent when they were offered Gardasil.

344. At the time she provided her consent to the Gardasil injections, Plaintiff was not aware of the falsity of Merck's aforementioned representations concerning the safety and efficacy of Gardasil.

345. Plaintiff reasonably and justifiably relied upon the truth of the assurance made by Merck in its direct-to-consumer marketing concerning the efficacy and safety of Gardasil (which were also echoed by Plaintiff's medical providers) when she provided consent to being injected with the Gardasil vaccine.

346. Had Merck's advertisements and promotional material, which Plaintiff received and on which she relied, provided complete and truthful warnings and properly disclosed and disseminated the true risks, limitations and lack of efficacy associated with Gardasil, then Plaintiff would not have consented to being injected with Gardasil.

347. Merck also engaged in a number of additional fraudulent activities that led to regulators, medical providers (including, upon information and belief, Plaintiff's medical providers), and the general public (including directly and/or indirectly Plaintiff) to be duped into believing that Gardasil is safe and effective. These fraudulent acts are outlined in greater detail in the preceding paragraphs of this Complaint, and included, among others:

        a)    Failing to test Gardasil against a true inert placebo and lying to the public that Gardasil was tested against a placebo, when in reality, all, or nearly

all, studies used a toxic placebo that included the dangerous aluminum adjuvant AAHS.

b) Failing to conduct a sufficient number of studies for the targeted patient population which included pre-teen girls (and boys) between the ages of nine and 12.

c) Not using the commercial dosage (and instead using a lower dosage of the adjuvant and ingredients) in one of the key clinical trials, which was used to obtain licensing for the commercial dosage of Gardasil;

d) Using very restrictive exclusionary criteria in the clinical study patient population (including for example, exclusion of anyone who had prior abnormal Pap tests, who had a history of immunological or nervous system disorders or was allergic to aluminum or other ingredients), but then not revealing or warning about these exclusionary criteria in the label and knowing that for most of these ingredients and allergies, there are limited resources for the public to test for such allergies in advance of being vaccinated;

e) Failing to disclose all the ingredients in Gardasil, including but not limited to the fact that Gardasil contains dangerous HPV L1-DNA fragments and that these DNA fragments could act as a Toll-Like Receptor 9 (TLR9) agonist – further adjuvanting the vaccine and making it more potent and dangerous.

348. Merck engaged in the above mentioned fraudulent conduct as well as the additional fraudulent conduct detailed throughout this Complaint with the intent to enhance

Gardasil's safety and efficacy profile and to conceal Gardasil's serious risks and efficacy shortcomings in order to secure regulatory approval and more importantly, so as to encourage physicians and medical providers to recommend Gardasil to patients and to prepare and encourage patients to request and consent to Gardasil injections.

349. Plaintiff could not reasonably have discovered the falsity of Merck's representations, the fraudulent nature of Merck's concealment, the fraudulent nature of Merck's conduct, and the defects and risks associated with Gardasil before or at the time of her injections. Plaintiff, members of the medical community, and upon information and belief, Plaintiff's doctor, Sara Weiderholt, M.D., directly and or indirectly relied upon the skill, superior knowledge, and judgment of Merck, the manufacturer, labeler, and promoter of Gardasil, and they directly or indirectly detrimentally relied upon Merck's fraudulent, false, and misleading statements, omissions, and conduct.

350. As a proximate result of Merck's misleading statements and omissions concerning the safety and efficacy of Gardasil, Plaintiff has suffered and continues to suffer severe and permanent physical injuries and permanent emotional injuries, including pain and suffering. Plaintiff also has a substantial fear of suffering additional and ongoing harms, including but not limited to now being at an increased risk of cancer, and future symptoms and harms associated with her autoimmune disease and other injuries caused by Gardasil.

351. As a direct and proximate result of her Gardasil-induced injuries, Plaintiff has suffered and continues to suffer economic losses, including considerable financial expenses for medical care and treatment, and diminished income capacity and she will continue to incur these losses and expenses in the future.

352. Merck's conduct, as described above, was oppressive, fraudulent, and malicious.

Merck regularly risks the lives of patients, including Plaintiff, with full knowledge of the limited efficacy of Gardasil and the severe and sometimes fatal dangers of Gardasil. Merck has made conscious decisions to not warn, or inform the unsuspecting public, including Plaintiff and her medical providers. Merck's conduct, including its false promotion of Gardasil and its failure to issue appropriate warnings concerning the severe risks of Gardasil, created a substantial risk of significant harm to children and patients who were being injected with Gardasil.

353.    WHEREFORE, Plaintiff requests that the Court enter judgment in her favor for compensatory and punitive damages, together with interest, and costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Julia Obermier, requests that the Court enter judgment in her favor and against Merck & Co., Inc., and Merck Sharp & Dohme, LLC (collectively "Merck") as to all causes of action, and awarding as follows:

A.    For compensatory damages, in an amount exceeding this Court's jurisdictional minimum and to be proven at trial;

B.    For economic and non-economic damages in an amount to be proven at trial;

C.    For medical, incidental, hospital, psychological and other expenses in an amount to be proven at trial;

D.    For loss of earnings and earnings capacity, in an amount to be proven at trial;

E.    For an award of pre-judgment and post-judgment interest as provided by law;

F.    For exemplary and punitive damages against Merck;

G.    For preliminary and/or permanent injunctive relief against Merck;

H. For an award providing for payment of reasonable fees, court costs, and other litigation expenses as permitted by law;

I. For such other and further relief as this Honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Julia Obermier, hereby demands a jury trial on *all* of her claims, causes of action and issues that are triable by jury.

Dated: July 14, 2025          RESPECTFULLY SUBMITTED,

By: /s/ Bijan Esfandiari
Bijan Esfandiari, Esq.
Michael Baum, Esq.
Monique Alarcon, Esq.
WISNER BAUM, LLP
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Fax: (310) 820-7444
besfandiari@wisnerbaum.com
mbaum@wisnerbaum.com
malarcon@wisnerbaum.com

Attorneys for Plaintiff